Jay D. SCOTT, Petitioner,

v.

Carl S. ANDERSON, Warden,
Respondent.

No. 1:95–CV–2037.

United States District Court,
N.D. Ohio,
Eastern Division.

Sept. 30, 1998.

768

John S. Pyle, Gold, Rotatori, Schwartz &
Gibbons, Cleveland, OH, Dale Andrew

Baich, Office of the Federal Public Defender, Phoenix, AZ, Timothy F. Sweeney, Law Offices of Timothy Farrell Sweeney, Cleveland, OH, for petitioner.

Lillian B. Earl, Office of the Assistant, Attorney General, Cleveland, OH, Stuart A. Cole, Charles L. Wille, Office of the Attorney General, Columbus, OH, for respondents.

## OPINION & ORDER

O'MALLEY, District Judge.

Jay D. Scott petitions this Court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. Scott challenges the constitutional sufficiency of his jury convictions for aggravated robbery and aggravated murder, and also challenges the constitutionality of the trial court's imposition of a sentence of death for his murder conviction.

For the reasons stated below, the Court **GRANTS IN PART** Scott's petition for writ of habeas corpus. Specifically, the Court finds that Scott's challenges to the constitutionality of his underlying convictions are without merit. The Court further finds, however, that Scott's challenge to the constitutionality of the trial court's imposition of the death penalty is well-taken, because the trial judge improperly instructed the jurors that they must unanimously recommend a life sentence.[1]

Accordingly, the Court issues a writ of habeas corpus as follows. The respondent shall either: (1) set aside Scott's sentence of death and instead impose a life sentence; or (2) conduct another sentencing trial. The respondent shall resentence Scott or conduct a new sentencing proceeding within 180 days from the effective date of this Order. On this Court's own motion, execution of this Order and, hence, its effective date, is stayed pending appeal by the parties.

### I. Procedural History.

On May 6, 1983, Ms. Vinnie Prince, the owner and operator of the V & E Delicatessen in Cleveland, Ohio, was shot and killed during an attempted armed robbery of her store. On May 17, 1983, petitioner Scott and three others[2] were indicted by the Cuyahoga County Grand Jury on two counts: (1) aggravated robbery, in violation of Ohio Rev.Code § 2911.01; and (2) aggravated murder, in violation of Ohio Rev.Code § 2903.01. Regarding the murder count, the Grand Jury added two specifications: (a) a death penalty specification, for violation of Ohio Rev.Code § 2929.04(A)(7); and (b) a firearm specification, for violation of Ohio Rev.Code § 2941.141.

Scott entered a plea of not guilty and went to trial on March 12, 1984.[3] The jury returned a verdict of guilty as charged on March 23, 1984. The trial court then held a sentencing hearing, pursuant to Ohio Rev.Code §§ 2929.022(A) & 2929.03. On March 28, 1984, the jury returned with the recommendation that Scott be given the death penalty. The trial judge adopted this recommendation and sentenced Scott to death for his murder conviction. In addition, the trial judge sentenced Scott to a term of imprisonment of 7–25 years for his conviction of aggravated burglary, and imprisonment of 3 years for the gun specification.

Scott timely appealed his convictions and also the imposition upon him of the death penalty. The Ohio Court of Appeals affirmed, as did the Ohio Supreme Court. State v. Scott, 1985 WL 9047 (Ohio Ct.App. May 23, 1985); State v. Scott, 26 Ohio St.3d 92, 26 O.B.R. 79, 497 N.E.2d 55 (1986). The United States Supreme Court denied his petition for a writ of certiorari, although two justices (Marshall and Bren-

---

**1.** That is, the Court finds Scott's eighteenth ground for relief well-taken, as discussed in section VI.E.3 of this Opinion. The Court finds that none of Scott's other grounds for relief are well-taken.

**2.** Scott's co-indictees were Edward O'Neal, Danny Jones, and Michael Streeter.

**3.** O'Neal, Jones, and Streeter all pleaded guilty to robbery offenses and received shock probation and/or suspended sentences.

nan) dissented. *Scott v. Ohio*, 480 U.S. 923, 107 S.Ct. 1386, 94 L.Ed.2d 699 (1987).[4]

Scott petitioned for post-conviction relief in state court, pursuant to Ohio Rev.Code § 2953.21.[5] Scott also filed a motion asking the trial judge to recuse himself from the post-conviction proceedings. The day after the State filed a motion to dismiss Scott's post-conviction petition, the state trial court judge denied the motion to recuse and granted the motion to dismiss. *Ohio v. Scott*, No. CR 182521 (Cuyahoga Cty. Ct. Common Pleas Jan. 28, 1988). On appeal, the Ohio Court of Appeals affirmed the denial of Scott's motion to recuse, but reversed in part the dismissal of Scott's petition and remanded the case for a hearing only on the issue of whether Scott was denied effective assistance of counsel at the mitigation hearing. *State v. Scott*, 63 Ohio App.3d 304, 578 N.E.2d 841 (1989). The Ohio Supreme Court denied the appeals of this ruling filed by both parties, so the case returned to the trial court for the mandated hearing. *State v. Scott*, 47 Ohio St.3d 705, 547 N.E.2d 986 (1989). Scott renewed his motion to recuse, but the trial judge implicitly overruled the motion by proceeding to hold the hearing. After holding this hearing, the trial court again denied Scott's petition for post-conviction relief. Scott unsuccessfully appealed this denial. *State v. Scott*, 1993 WL 267109 (Ohio Ct.App. 8th Dist. July 15, 1993), *motion overruled*, 68 Ohio St.3d 1426, 624 N.E.2d 1064 (1994). The United States Supreme Court denied Scott's petition for writ of certiorari, with Justice Blackmun dissenting. *Scott v. Ohio*, 512 U.S. 1213, 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994).

In addition to these post-conviction proceedings, Scott also pursued post-conviction relief pursuant to *Ohio v. Murnahan*, 63 Ohio St.3d 60, 584 N.E.2d 1204, 1209 (1992), which holds that an appellant who claims he was denied the effective assistance of appellate counsel may obtain relief by applying for delayed reconsideration in the Court of Appeals, or filing a delayed appeal directly to the Ohio Supreme Court. Specifically, Scott first filed a motion to reopen his appeal in the Ohio Court of Appeals. This motion was denied. *State v. Scott*, Cuyahoga App. No. 48609 (Ohio Ct.App. 8th Dist. Sept. 17, 1992). The Ohio Supreme Court affirmed this decision, with Justice Wright dissenting, *State v. Scott*, 67 Ohio St.3d 1485, 621 N.E.2d 407 (1993), and the United States Supreme Court denied certiorari, with Justice Blackmun dissenting, *Scott v. Ohio*, 512 U.S. 1246, 114 S.Ct. 2769, 129 L.Ed.2d 883 (1994). Scott also filed a motion with the Ohio Supreme Court to accept a direct delayed appeal, but the Ohio Supreme Court refused. *State v. Scott*, 67 Ohio St.3d 1485, 621 N.E.2d 407 (1993).

The State of Ohio then filed a motion to set an execution date. The Ohio Supreme Court granted the motion, setting the date of execution for October 25, 1995. On September 20, 1995, Scott filed in this Court a notice of intent to file a petition for writ of habeas corpus. Scott then moved for a stay of execution, and on October 12, 1995, this Court granted an indefinite stay of execution, pending decision on the instant petition for writ of habeas corpus.

*II. Factual History.*

When it considered Scott's direct appeal of his convictions and sentence, the Ohio Supreme Court set out the factual history of this case, as revealed by the evidence adduced at Scott's trial. *State v. Scott*, 26 Ohio St.3d 92, 497 N.E.2d 55, 56–58 (1986).

---

**4.** Scott was represented at trial by attorneys Gary Eisner and Thomas Wagner. Scott was represented during all of his direct state court appeals by attorneys Hyman Friedman and Marillyn Fagan Damelio of the Cuyahoga County Public Defender's Office. Scott was represented during his petition for writ of certiorari on direct appeal by Robert Ingersoll of the Cuyahoga County Public Defender's Office.

**5.** Scott was represented during his post-conviction proceedings (up to but not including the time he filed the instant petition for writ of habeas corpus) by Joann Bour–Stokes of the Ohio Public Defender Commission.

This Court repeats that evidence here, using the Ohio Supreme Court's language.

On May 6, 1983, Vinnie M. Prince, owner and operator of the V & E Delicatessen at East 86th Street and Quincy Avenue in Cleveland, was shot and killed during an attempted armed robbery of her shop. An autopsy later revealed that Prince died from a gunshot wound to the chest.

Octavia Hickman, a nearby resident, testified that while walking back to her home after shopping at the nearby Sav-more Market, she noticed a greenish-blue Cadillac without a rear license plate pull up across from her house. She observed two black males inside the car, one behind the wheel and the other in the back seat. She later observed another black male come over a nearby fence and dive through the open window of the Cadillac. The car then drove away.

Another witness near the delicatessen when the incident occurred was Clifford Roberson. Roberson was heading toward the store with a female companion when they heard a shot fired inside the store. He immediately grabbed his friend and pushed her up against the wall of the building, in an effort to protect her. When he heard a screen door slam, he turned around and saw two black males running from the store. Roberson testified that the taller man was about five feet eleven inches tall, wearing "some type of rag around his head," and holding a long-barreled pistol. Upon opening the store's door, Roberson observed Prince lying "almost to the door as if she was trying to chase them or something." Roberson proceeded to flag down a nearby police car and informed the officers of the situation.

Another witness to this incident, Solomon Smith, testified he saw "two men run across the street, and run down to the corner of Mr. Cooper's house, and turn through the alley, and jump the fence." He described these assailants as two black males, one 5'10½" tall, the other "a little shorter." Smith did not observe anything in either of the fleeing mens' hands.

Sometime after this incident, Detective Robert Moore received a telephone call from Ricky Tramble, and Moore arranged a meeting. Tramble testified at trial that, at this meeting, he informed Officer Moore that on the day Vinnie Prince was killed, he was with Edward O'Neal, Michael Streeter, Danny Jones, and Jay D. Scott; they were all at O'Neal's girlfriend's house, "to get high." Tramble stated he overheard Scott say, "Well, I did what I had to do. She shouldn't have made me move like that. Fuck it. It's over with." Tramble testified that, later that day, Scott told Tramble, "[t]hese niggers don't know what they're doing. * * * [T]hey get to crying about this and crying about that. This is what I do." Scott professed to Tramble he was "a stick-up man." Tramble further related that, the next day, O'Neal informed him that Scott and O'Neal were involved in the V & E Delicatessen incident, including the shooting of Prince.

Pursuant to this information, the police subsequently apprehended and arrested Danny Jones. The police confiscated Jones's automobile, an older model, blue, turquoise-bottom Cadillac with a white top and no license plate, but with a thirty-day tag. Jones signed a typewritten statement stating that he and O'Neal, Streeter, and Scott had been driving around, looking for a place to rob. After selecting the V & E Delicatessen as a target, Scott requested "front money" in order to fabricate a purchase, and wanted someone to go into the store with him. O'Neal finally agreed to accompany Scott into the store. At this time, Jones observed Scott was armed with a .38 caliber pistol that looked like a police revolver, and O'Neal was armed with a .25 caliber automatic handgun. Jones pulled his car around the corner from the V & E Delicatessen, and O'Neal and Scott got out of the car while Jones and Streeter waited for them. Later, Scott and O'Neal came running through a yard and climbed over a fence. O'Neal ran to the car and got in and Scott dove into the car through a window. Jones was

told to "pull off." Later, Jones asked O'Neal what happened and O'Neal replied "that J.D. shot her * * * cause she went for her shit (her gun)." When Jones asked Scott if he had killed her, Scott replied, "naw she was still standing up when we ran out the door." At trial, Jones repudiated that part of his typewritten statement wherein he acknowledged their intent to rob the V & E Delicatessen. Instead, Jones contended that Scott and O'Neal had gone into the store to get cold beer.

The police also apprehended Edward O'Neal, who also gave a typewritten statement to the police. O'Neal stated that he, Jones, Streeter, and Scott were driving around in Jones's Cadillac. They stopped in front of the V & E Delicatessen because Scott told them he wanted to get some bologna and crackers. O'Neal followed Scott into the store. Scott asked for bologna and crackers and, when the old woman minding the store turned to obtain them, Scott pulled out a pistol. Scott told the woman to "freeze" and when the woman began to "holler" and "yell," Scott fired a single shot at the woman, striking her. O'Neal related that he was momentarily stunned by this occurrence and it wasn't until Scott grabbed him and pulled him out of the store that he began to run. They jumped a fence and ran to the car. O'Neal stated that he did not observe the old woman in the store reach for a weapon.

At trial, O'Neal's testimony differed from this written statement in that he testified it was he who ordered the bologna and crackers at the store. In addition, O'Neal asserted that he was unarmed throughout this ordeal and that Michael Streeter had the .25 caliber weapon in his possession while waiting in the car. O'Neal confirmed that he had talked with Ricky Tramble about what had transpired at the V & E Delicatessen.

Barbara Campbell, a trace-evidence analyst with the Cuyahoga County Coroner's office, testified that, pursuant to the Walker Nitrate Test, the muzzle of the gun which killed Vinnie Prince was estimated to have been twelve inches from her body when it was fired. Campbell further testified that a trace metal test conducted on the victim's hands indicated that Prince did not handle or fire a weapon prior to her death. However, Detective David Hicks testified that Prince had a fully loaded .38 caliber revolver on her person when she was found.

On May 17, 1983, the grand jury charged Scott with: (1) aggravated murder, with an aggravated robbery specification and a firearm specification, and (2) aggravated robbery. Also charged in the same indictments were co-defendants Danny Jones, Edward O'Neal and Michael Streeter. On November 10, 1983, Scott was apprehended in Philadelphia by Detective James Svekric of the Cleveland Police Department. During the trip back to Cleveland, Scott inquired who was using his name in connection with a homicide and robbery. Up to that point, the arresting officers had informed Scott that he was wanted in connection with a homicide, but had made no mention that Scott was also charged with aggravated robbery. Scott maintained he had been in Reading, Pennsylvania when the incident occurred.

## III. Habeas Proceedings.

On September 20, 1995, Scott filed a notice of intent to file a habeas petition, a motion to proceed in forma pauperis, and a motion for appointment of counsel. The Court granted the latter two motions and appointed John S. Pyle and Timothy Sweeney as co-counsel for Scott.[6] Scott also moved for a stay of execution. On October 12, 1995, this Court granted an indefinite stay of execution, pending decision on the instant petition for writ of habeas corpus.

Scott filed his petition on February 2, 1996, and respondent filed a return on April 4, 1996. Scott then moved for a

6. The Court is compelled to mention that Scott has received excellent representation from his appointed habeas counsel. The briefing and oral argument in this case by all counsel has been exceptionally strong, and Scott's counsel has been especially thorough.

ruling that the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") did not apply to his habeas action. After the parties briefed the issue, this Court ruled that "Section 107 (Chapter 154) of the [AEDPA] is not applicable to this proceeding[ and] Section 104 of the [AEDPA] is." Order at 2 (March 7, 1997). Specifically, the Court concluded that Chapter 154 "is not applicable to this matter because Ohio is not an 'opt-in' state under the express terms of that Chapter." *Id.* at 10. The Court further concluded that Section 104—which increased the deference this Court must give to prior state court determinations, both of law and fact, and redefined the burdens applicable in evidentiary hearings held in connection with habeas corpus petitions filed by prisoners in state custody—was "applicable to the Court's resolution of the issues raised in the petition in this matter," even though Scott filed his petition about three months before the AEDPA became law. *Id.*

Scott filed a traverse on April 21, 1997, and respondent filed a reply to the traverse on May 5, 1997. Scott then filed a motion for leave to conduct discovery. The Court denied this motion for lack of a specific showing of necessity, but allowed Scott to move again for narrow discovery after his investigator's work was complete. Hearing tr. at 17–19 (May 30, 1997); Order at 1 (June 2, 1997). Scott then filed a supplemental motion for leave to conduct discovery, which the Court denied because Scott had not shown good cause. Order at 1 (Oct. 27, 1997). By separate Order of the same date, the Court also denied Scott's motion for an evidentiary hearing.

On June 23, 1997, the supreme Court decided *Lindh v. Murphy,* 521 U.S. 320, 117 S.Ct. 2059, 2068, 138 L.Ed.2d 481 (1997). *Lindh* interpreted the AEDPA to mean that, in cases like this one, which were pending at the date of enactment, federal courts must apply the former statute's presumption of correctness regarding state court determinations, 28 U.S.C. § 2254(d) (1994), rather than the new standards requiring greater deference to the state court determinations required under the amended statute, 28 U.S.C. § 2254(e) (1998). Accordingly, in its Order dated October 27, 1997, this Court vacated that part of its March 7, 1997 Order which had held that Section 104 of the AEDPA applied to this case.[7]

On November 12, 1997, the parties presented lengthy oral argument regarding the procedural issues raised by, and substantive merits of, Scott's petition. Following this oral argument, the Court invited the parties to present post-hearing briefs regarding certain points and suggested that further briefing might be necessary to address any impact the *Lindh* decision might have on the parties' respective arguments. The parties each tendered post-hearing briefs on December 12, 1997. Having had the benefit of all of these habeas proceedings, the Court is now well-educated to all the substantive and procedural issues that Scott and respondent raise.

*IV. Scott's Grounds for Relief.*

In his petition, Scott asserts 21 separate grounds for relief, which he divides into three categories: (1) constitutional violations which tainted the entire course of the state court proceedings (grounds 1–6); (2) constitutional violations which prejudiced Scott during specific stages of the state court proceedings (grounds 7–19); and (3) constitutional violations relating generally to the Ohio death penalty scheme (grounds 20–21). Scott's 21 separate grounds for relief are quoted below.

*A. Category One—Violations Which Tainted the Entirety of the State Court Proceedings.*

1. Mr. Scott was denied his right to a fair trial with an impartial jury in

---

**7.** *Lindh* was a 5–4 decision, in which the dissent employed the same analysis this Court used in its March 7, 1997 Order.

violation of the Fifth, Eighth and Fourteenth Amendments to the United States Constitution because the trial judge told the prospective jurors that, according to newspaper reports, the Petitioner and other men were involved in the murder.

2. Mr. Scott's death sentence is in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the only statutory "aggravating circumstance" he was charged with (felony murder) merely duplicated elements of the underlying death-eligible offense (murder in the course of committing a felony) and was unconstitutionally vague, overbroad and imprecise as applied to him.

3. Mr. Scott's death sentence is further invalid because it was obtained through the use of a non-statutory aggravating circumstance; to wit, a firearm specification, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

4. Petitioner was denied the effective assistance of counsel during the guilt/innocence phase of his trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

5. Petitioner was denied the effective assistance of counsel in the mitigation phase of his trial.

6. The Petitioner was denied the effective assistance of appellate counsel as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

B. *Category Two—Violations Which Tainted A Portion of the State Court Proceedings.*

7. The Petitioner was denied his right to a fair trial with an impartial jury because prospective jurors who expressed any reservation about the death penalty were excused while jurors favoring the death penalty in homicide cases were retained.

8. The Petitioner was denied his right to a fair trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because of prosecutorial misconduct during the guilt/innocence phase of the trial.

9. The Petitioner's conviction and death sentence were obtained with evidence which was insufficient as a matter of law in violation of the Fifth Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

10. The Petitioner was denied his constitutional rights to due process and a fair trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the trial judge refused to give several essential jury instructions.

11. The Petitioner was denied his right to a fair trial because the trial judge provided the jury with an erroneous definition of "reasonable doubt" in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

12. The Petitioner was denied his rights to a fair trial and an individualized sentencing determination in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because of prosecutorial misconduct during the sentencing phase of the trial.

13. The Petitioner was denied his right to a fair trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because of comments made by the prosecutor and the trial judge concerning the un-

sworn statement Petitioner made during the mitigation hearing.

14. The Petitioner was denied his right to a fair trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the trial judge instructed the jury that their death recommendation was not binding on the court.

15. The Petitioner was denied his right to a fair trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the trial judge improperly instructed the jury concerning mitigating circumstances and applied the same erroneous standards in his decision to impose the death penalty.

16. The Petitioner was denied his right to a fair trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the trial judge instructed the jury to exclude considerations of mercy.

17. The Petitioner was denied his right to a fair trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the trial judge failed to instruct the jury that it must make a specific finding as to the specific intent to kill.

18. The Petitioner was denied his right to a fair trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the trial judge improperly instructed the jurors that they must unanimously recommend a life sentence.

19. The Petitioner was denied his right to a fair trial in violation of the Fifth Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the Ohio Court of Appeals and the Ohio Supreme Court applied improper standards of review in denying relief for federal constitutional violations.

*C. Category Three—Violations Relating Generally to the Ohio Death Penalty Scheme.*

20. The statutory provisions governing the Ohio capital punishment scheme violate the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as well of the Supremacy Clause of Article VI of the United States Constitution. This scheme is unconstitutional on its face.

A. Constitutional flaws in trial proceedings created by the Ohio statutory scheme.

B. Constitutional flaws in sentencing proceedings created by the Ohio death penalty statute.

C. Constitutional flaws in appellate proceedings created by the Ohio death penalty statutes.

D. Societal interests are not served by the Ohio death penalty statutes.

E. Imposition of the death penalty demonstrates a blatant disregard for the value of human life, entails unnecessary and wanton infliction of pain and diminishes the dignity of man.

F. The Ohio death penalty statute violates the Supremacy Clause of the United States Constitution and various international laws including, but not limited to, the Organization of American States Treaty and the American Declaration of the Rights and Duties of Man.

21. The Ohio death penalty scheme is unconstitutional as applied to the Petitioner.

*V. The Law of Procedural Default.*

The respondent argues that Scott is precluded from pursuing half of his stated grounds for issuance of the writ, on the

basis of procedural default. Later in this opinion, the Court addresses the question of procedural default with respect to each individual ground asserted. First, however, the Court here sets out the applicable law and addresses a few of Scott's overriding arguments.

■ Normally, a federal court may not consider "contentions of federal law which are not resolved on the merits in the state proceeding due to petitioner's failure to raise them as required by state procedure." *Wainwright v. Sykes,* 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). If a "state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 749, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

In *Maupin v. Smith,* 785 F.2d 135 (6th Cir.1986), the Sixth Circuit Court of Appeals set out the analytical framework for determination of claims of procedural default. "When a state argues that a habeas claim is precluded by the petitioner's failure to observe a state procedural rule, the federal court must go through a complicated [four-step] analysis." *Id.* at 138.

First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.... Second, the court must decide whether the state courts actually enforced the state procedural sanction.... Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim. [And fourth, if] the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate ... that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Id.* (citations omitted).

Regarding the first step of the *Maupin* analysis, respondent points to three different Ohio procedural rules applicable to Scott's claims, with which Scott failed to comply. Specifically, respondent asserts that: (1) Scott's grounds for relief 3, 4, 5, and 8 are procedurally barred because Scott did not raise these grounds on direct appeal, as Ohio requires pursuant to Ohio R.App. P. 16(A)(4) and *State v. Perry,* 10 Ohio St.2d 175, 226 N.E.2d 104 (1967);[8] (2) Scott's grounds for relief 11, 14, 16, and 18 are procedurally barred because Scott did not make a contemporaneous objection at trial, as Ohio requires pursuant to *State v. Glaros,* 170 Ohio St. 471, 166 N.E.2d 379 (1960) and Ohio R.Crim. Pro. 30(A);[9] and

---

8. Ohio R.App. P. 16(A)(3) states that "[t]he appellant shall include in its brief ... [a] statement of the assignments of error presented for review ...." The *"Perry* rule" states that "[u]nder the doctrine of res judicata, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial, which resulted in that judgment of conviction, or on an appeal from that judgment." *State v. Perry,* 10 Ohio St.2d 175, 226 N.E.2d 104, syllabus ¶9 (1967).

9. *Glaros* states that "[i]t is a general rule that an appellate court will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court." *State v. Glaros,* 170 Ohio St. 471, 166 N.E.2d 379, syllabus ¶1 (1960). Ohio Rule of Criminal Procedure 30(A) states that "[o]n appeal, a party may not assign as error the giving or failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating the manner objected to and the grounds of the objections."

(3) Scott's grounds for relief 12, 19, and 20 are procedurally barred because Scott did not ever present these grounds to any Ohio court, either on direct appeal or during post-conviction proceedings, as is obviously required before the state can address the issues.

Scott attacks respondent's procedural bar arguments in two ways. First, to at least some extent, Scott undertakes an individualized *Maupin* analysis with respect to each of the grounds that respondent claims Scott has waived. The Court examines these arguments below, in the context of its analysis of each individual ground.

■ Second, Scott presents several broad defenses, challenging respondent's procedural bar arguments in general. For example, Scott asserts that this Court must decide the *Maupin* analysis in his favor, as a matter of law, as to *every* ground he has allegedly waived by not raising it on direct appeal, because this Court cannot find under the second prong of the *Maupin* test that Ohio "courts actually enforced the state procedural sanction" through a valid process. *Id.* More specifically, Scott argues that, although the Ohio courts enforced state procedural sanctions against him by refusing to consider, during post-conviction proceedings, claims he had not made on direct appeal, the entire post-conviction process in Ohio is constitutionally defective; thus, this Court should consider the state courts' enforcement of Ohio's procedural sanctions void.

The Court is not persuaded by this argument. First, Scott cannot excuse his own failure to present claims to the state appellate courts based on the allegation that the entire post-conviction review process is systemically infirm. To quote another district court that rejected the same argument:

> Petitioner's argument that the *Perry* rule rests on an Ohio postconviction system which does not meet the requirements of due process lacks merit. Petitioner knew of the availability of direct appeal for of record claims and knew that if he failed to present the claims on direct appeal they were waived. Any perceived deficiencies in Ohio's postconviction system did not relieve petitioner of the obligation to raise these waived claims on *direct appeal*. He was not misled in any way by the Ohio courts about what remedy he could pursue.

*Beuke v. Collin,* Case no. C-1-92-507, slip op. at 19 (S.D.Ohio Oct. 19, 1995) (emphasis in original); *see id.* at 68-69 (discussing and reaffirming this conclusion). Furthermore, despite Scott's eloquent argument, the Court is not convinced that the entire state post-conviction review process is, in fact, "futile" and "doomed from the start." Traverse at 79-80. As Scott himself notes, in 8 out of 68 cases—and one of those 8 cases is this case—courts of appeals *have* vacated at least part of the trial court's post-conviction judgment. It is not overly deferential to the state courts to assume that the vast majority of such trials proceed without error of a constitutional magnitude. It is notable, moreover, that the universe of cases that the state courts of appeals subject to post-conviction review does not include cases where the same appellate courts earlier found error on direct appeal, as occurred in Scott's own subsequent murder trial.[10] Scott's argument that the scope of post-conviction review in Ohio has narrowed substantially over time, and that the state appellate courts' track record in post-conviction proceedings bespeaks futility, though articulate, is ultimately not convincing.

■ Scott presents another broad defense challenging respondent's procedural bar arguments in general: Scott asserts that this Court must decide the *Maupin* analysis in his favor, as a matter of law, as to *every* ground he has allegedly waived, because this Court cannot find under the third prong of the *Maupin* test that any of the state procedural rules relied upon by

---

**10.** See footnote 11 at p. 782, *infra.*

the respondent are "adequate." A procedural rule is not "adequate" unless, among other things, it is regularly and consistently applied. *Warner v. United States,* 975 F.2d 1207, 1213 (6th Cir.1992), *cert. denied,* 507 U.S. 932, 113 S.Ct. 1314, 122 L.Ed.2d 702 (1993). Scott argues that Ohio courts are very inconsistent in their application of the procedural rules upon which the respondent bases his waiver arguments, especially the *Perry* rule and especially in capital cases, and that he thus cannot be held to have procedurally defaulted under *Maupin.* Again, the Court is not persuaded by this argument. While the Ohio courts of appeals may not be paradigms of consistency, they do not ignore or arbitrarily deny Ohio's procedural bars, including the *Perry* rule, on a regular basis. *See Beuke v. Collin,* slip op. at 65 ("[p]etitioner has not cited a single case holding that a consistently enforced state procedural bar[,] which on some occasions is not invoked for unexplained reasons generally consistent with plain error review[,] should not be enforced in federal habeas corpus").

■ A third broad defense challenging some of respondent's procedural bar arguments relates to Scott's assertions of ineffective assistance of counsel. The merits of these assertions are discussed below in section VIII of this opinion, but the Court addresses one aspect of these assertions here. On direct appeal, Scott did *not* assert he was deprived of his right to effective assistance of *trial* counsel. As discussed below, Scott thereby waived this ground. Scott now also asserts he was deprived of his right to effective *appellate* counsel, and that his appellate counsel should have raised certain grounds on direct appeal, including ineffective assistance of *trial* counsel. Scott then attempts to use this argument to bootstrap himself around the procedural bar. Scott suggests that: (1) appellate counsel's failure to claim ineffective assistance of trial counsel led to waiver of certain grounds; (2) appellate counsel's failure to assert other grounds led to further waivers; and (3) Scott should thus be allowed to raise all

waived grounds under the rubric of ineffective trial and appellate counsel. This position is untenable. Scott's logic would completely eviscerate the doctrine of procedural bar, as otherwise-waived grounds could always be resurrected by asserting prior counsel's ineffective failure to raise them.

Scott also presents a few other broad defenses to respondent's procedural bar arguments in general. The Court addresses these arguments below, to the extent necessary, in its discussion of each of Scott's individual grounds for relief.

## VI. Scott's Attacks on His Sentence of Death.

Scott's various grounds for relief tend to focus on either the constitutionality of his conviction, or the constitutionality of his death sentence. The Court first addresses those grounds that focus on the constitutionality of his death sentence.

### A. Scott's Second Ground for Relief.

Scott's second ground for relief is that his death sentence was unconstitutional "because the only statutory 'aggravating circumstance' he was charged with (felony murder) merely duplicated elements of the underlying death-eligible offense (murder in the course of committing a felony) and was unconstitutionally vague, overbroad and imprecise as applied to him." Essentially, Scott argues that Ohio's capital sentencing scheme does not, as it must, "genuinely narrow the class of persons eligible for the death penalty and ... reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). The respondent does not argue that Scott has procedurally defaulted on this claim.

Scott's indictment charged him with committing aggravated murder, in violation of Ohio Rev.Code § 2903.01(B), by "purposely caus[ing] the death of another, to-wit: Vinney [sic] Prince while commit-

ting or attempting to commit, or while fleeing immediately after committing or attempting to commit Aggravated Robbery." The indictment additionally specified that, in violation of Ohio Rev.Code § 2929.04(A)(7), Scott committed the aggravated murder while he "was committing or attempting to commit or fleeing immediately after committing or attempting to commit Aggravated Robbery and either [he] was the principal offender in the commission of the Aggravated Murder or, if not the principal offender, committed the Aggravated Murder with prior calculation and design." [11]

■ Scott argues that the aggravating specification contained in § 2929.04(A)(7) merely duplicates the definition of felony murder in § 2903.01(B), and thus that the same act both convicts and aggravates. This argument is not well-taken. As noted by the Ohio Supreme Court, "while a conviction under R.C. § 2903.01(B) cannot be sustained unless the defendant is found to have intended to cause the death of another, the [S]tate, in order to prevail upon an aggravating circumstance under R.C. § 2929.04(A)(7), must *additionally* prove that the offender was the principal offender in the commission of the aggravated murder or, if the offender was not the principal offender, that the aggravated murder was committed with prior calculation and design." *State v. Jenkins,* 15 Ohio St.3d 164, 473 N.E.2d 264, 280 n. 17 (1984), *cert. denied,* 472 U.S. 1032, 105

S.Ct. 3514, 87 L.Ed.2d 643 (1985) (emphasis added). Thus, "[t]he trial court had to find that [Scott] committed murder while committing or attempting to commit [aggravated robbery] *and, further,* that [Scott] was the principal offender or that the murder was premeditated." *State v. Barnes,* 25 Ohio St.3d 203, 495 N.E.2d 922, 925 (1986), *cert. denied,* 480 U.S. 926, 107 S.Ct. 1388, 94 L.Ed.2d 701 (1987) (emphasis added). This additional factor does "narrow the class of persons eligible for the death penalty," *Zant,* 462 U.S. at 877, 103 S.Ct. 2733—Scott's "accomplice could be convicted of aggravated murder but would not be subject to the death penalty." *Id.* "By such a limitation, the category of death-eligible aggravated murderers is narrowed in compliance with *Zant* and no constitutional violation arises." *Id.*

■ Moreover, even if it were true that the same act both convicted and aggravated under § 2903.01(B) and § 2929.04(A)(7), this alone would not provide grounds for issuance of the requested writ. "[T]he fact that the aggravating circumstance duplicate[s] one of the elements of the crime does not [alone] make [a death] sentence infirm." *Lowenfield v. Phelps,* 484 U.S. 231, 246, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). The narrowing function required by *Zant* may be performed by the state legislature. *Id.* at 246–47, 108 S.Ct. 546; *see id.* 108 S.Ct. at 561 (Brennan, J., dissenting) ("the critical narrowing function

**11.** *The wording of this specification essentially tracks the language of § 2929.04(A)(7). Section 2929.04 sets out the aggravating circumstances that define when the death penalty may be imposed. Only the circumstance set forth in § 2929.04(A)(7) was at issue in this case. This is so even though Scott murdered another person (Alex Jones) less than 24 hours after he murdered Vinnie Prince. Section 2929.04(A)(5) states that the death penalty may be imposed if, "[p]rior to the offense at bar, the offender was convicted of an offense[,] an essential element of which was the purposeful killing of or attempt to kill another." The indictment in this case did not include this specification because Scott neither murdered nor was convicted of murdering Jones until after he murdered Prince. By* the same token, Scott's murder of Prince could not be considered an aggravating factor in the prosecution of Scott for the Alex Jones murder, because the Prince *conviction* did not predate the Jones murder. Indeed, Scott escaped the death penalty for having murdered Jones altogether when, on direct appeal, the state court of appeals concluded it "cannot uphold the death sentence due to the exposure of the jury to a nonadmissible aggravating factor of a previous death sentence." *State v. Scott,* 1988 WL 132574 at *5 (Ohio Ct.App. Dec. 9, 1988) (basing its conclusion on the fact that "four jurors had seen a newspaper article which discussed [Scott's] prior murder conviction [of Prince] and [which] stated that he had been sentenced to death").

may be performed [by the legislature] prior to and distinct from the sentencing process" to ensure "that the number of those eligible for the death penalty [are] smaller than the number of those convicted of murder"). With § 2929.04(A), the Ohio General Assembly "narrow[ed] the class of felony murders subject to the death penalty by excluding those who commit [murder in the course of an] arson, robbery, burglary or escape, unless they are charged with a different aggravating circumstance." *State v. Buell*, 22 Ohio St.3d 124, 489 N.E.2d 795, 807 (1986), *cert. denied*, 479 U.S. 871, 107 S.Ct. 240, 93 L.Ed.2d 165 (1986). Thus, Scott's second ground for relief is not well-taken.

### B. Scott's Third Ground For Relief.

Scott's third ground for relief is that his death sentence was unconstitutional "because it was obtained through the use of a non-statutory aggravating circumstance; to wit, a firearm specification." As noted above, Scott's indictment for aggravated murder included two specifications: (a) a death penalty specification, for violation of Ohio Rev.Code § 2929.04(A)(7); and (b) a firearm specification, for violation of Ohio Rev.Code § 2941.141. The second specification charged that, when Scott committed Prince's murder, he "had a firearm on or about [his] person or under [his] control." The jury found Scott guilty of this specification.

The trial court and counsel made reference to both the firearm and death penalty specifications during voir dire and the guilt phase of Scott's trial. After the jury found Scott guilty, the trial court turned to the penalty phase of the trial. The trial court instructed the jurors on what aggravating circumstances they could consider, and how to weigh them against any mitigating circumstances, when they deliberated over the penalty Scott should receive. Specifically, the trial court instructed the jurors that they could only recommend death if they found Scott was guilty of the *death penalty specification*. The trial court made no reference to the *firearm specification*—neither including it nor explicitly

excluding it as an aggravating circumstance.

Scott insists that, because the trial court did not explicitly instruct the jury that it could *not* consider the firearm specification as an aggravating circumstance during their penalty deliberations, the jury was "hopelessly confused as to what it could and could not consider as aggravating circumstances in the weighing process, thereby virtually guaranteeing that invalid, non-statutory aggravating factors were considered as part of the calculus that resulted in Mr. Scott's death sentence." Traverse at 26. Scott notes that the trial court and the prosecutor referred to "aggravating circumstances" (plural) during the penalty phase, which Scott argues further misled the jury. The respondent argues that Scott has procedurally defaulted this ground because he did not present it on direct appeal, and further that it is meritless in any event.

■ The Court agrees that Scott procedurally defaulted on this ground, and thus that this Court may not consider it under *Wainwright*. Scott raised this ground for relief for the first time in his state post-conviction proceedings. The state court of appeals, in post-conviction review, concluded Scott had failed to follow the *Perry* rule, and thus procedurally defaulted on this ground. The state court held:

> The indictment contained two specifications. The first was an aggravating circumstance that must be proven before the death penalty may be imposed. The second was a gun specification. Appellant contended that the record reveals repeated references to aggravating circumstances (in the plural) and thus the jury believed that both were aggravating circumstances.
>
> This issue could have been determined without resort to evidence *dehors* the record and *res judicata* was a proper grounds for dismissal.

*State v. Scott*, 63 Ohio App.3d 304, 578 N.E.2d 841, 846 (1989), *motion overruled*,

47 Ohio St.3d 705, 547 N.E.2d 986 (1989). This Court agrees that: (1) Scott's new counsel on direct appeal could have raised the issue of the trial court's failure to explicitly instruct the jury that it could not consider the firearm specification as an aggravating circumstance during penalty deliberations; and (2) the issue presented itself by reference to the trial record itself, and not significantly or even partly by reference to evidence outside the trial record. Whether Scott's appellate counsel failed to raise this issue as a result of a strategic decision or mere oversight, respondent's assertion that this ground is procedurally barred must be upheld, under the *Maupin* test. Accordingly, the Court finds Scott's third ground for relief is not well-taken.[12]

### C. Scott's Twelfth and Eighth Grounds for Relief.

Scott's twelfth ground for relief is that he was unconstitutionally "denied his rights to a fair trial and an individualized determination ... because of prosecutorial misconduct during the sentencing phase of the trial." In his eighth ground for relief, Scott asserts he was the victim "of prosecutorial misconduct during the guilt/innocence phase of the trial." Although this latter ground focuses more on the constitutionality of his conviction, not his death sentence, the Court addresses these two related grounds together.

Scott contends the prosecutor engaged in misconduct when, during the course of the guilt phase of trial, the prosecutor repeatedly described Scott as a person who made his living by robbing people, and referred to Scott during closing argument as "Jesse James." Scott contends these statements were improper because they were "evidence" of unproven and un-

charged acts of robbery, and because they suggested to the jury that it should convict Scott because he was a habitual criminal. Scott also asserts the prosecutor engaged in further misconduct when, during the penalty phase of trial, the prosecutor stated, "you saw him up here—this certainly was my impression, but it is your impression that counts, but an angry, almost frighteningly so, individual and I saw no remorse." Scott argues that this statement improperly converted a mitigating factor (remorse) into an aggravating circumstance (lack of remorse).

The respondent argues that both of these related grounds are procedurally barred because Scott did not raise a contemporaneous objection to the comments at trial, nor did Scott object that the comments were improper on direct appeal. The first time Scott raised these grounds for relief was during his state post-conviction proceedings. The state court of appeals, in post-conviction review, concluded Scott had failed to follow the *Perry* rule and thus had procedurally defaulted on these grounds, holding that claims of prosecutorial misconduct "could have been raised on direct appeal. *Res judicata* was a proper grounds for dismissal." *State v. Scott*, 63 Ohio App.3d 304, 578 N.E.2d 841, 847 (1989), *motion overruled*, 47 Ohio St.3d 705, 547 N.E.2d 986 (1989).

This Court again agrees that: (1) Scott's new counsel on direct appeal could have raised the issue of prosecutorial misconduct, during either the guilt or penalty phases of trial; and (2) this issue presented itself by reference to the trial record itself, and not significantly or even partly by reference to evidence outside the trial record. Again, whether Scott's appellate

---

12. Without explicitly so holding, the Court adds that it appears Scott's third ground for relief is also not well-taken on the merits. Given that "[j]uries are presumed to follow their instructions," *Zafiro v. United States*, 506 U.S. 534, 540, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993), the trial court's references to "aggravating circumstances" (plural) before giving its instructions regarding the only appro-

priate "aggravating circumstance" (singular) during penalty deliberations appear harmless. Scott's citation of *State v. Johnson*, 24 Ohio St.3d 87, 494 N.E.2d 1061 (1986), is inapposite; in *Johnson*, the trial court explicitly and affirmatively instructed the jury that they *could* consider a firearm specification as a death penalty aggravating circumstance.

I'm

counsel failed to raise these issues as a result of a strategic decision or mere oversight, the respondent's claim that these grounds are procedurally barred must be upheld, under the *Maupin* test. Accordingly, the Court finds Scott's eighth and twelfth grounds for relief are not well-taken.[13]

### D. Scott's Thirteenth Ground for Relief.

■ Scott's thirteenth ground for relief is that his death sentence was unconstitutional "because of comments made by the prosecutor and the trial judge concerning the unsworn statement [that Scott] made during the mitigation hearing." After Scott was found guilty, he elected to make an unsworn statement to the jury for the purpose of presenting factors in mitigation of his sentence. Scott made this statement pursuant to Ohio Rev.Code § 2929.03(D)(1), which states: "The defendant shall be given great latitude in the presentation of evidence of the [statutory] mitigating factors ... and of any other factors of mitigation of the imposition of the sentence of death. If the offender chooses to make a statement, the offender is subject to cross-examination only if the offender consents to make the statement under oath or affirmation."

After Scott made his statement to the jury, Scott's trial counsel moved in limine to preclude the prosecutor from commenting during closing argument on the unsworn nature of Scott's statement. The trial court denied this motion, and the prosecutor proceeded to comment that Scott's declaration was not under oath and that the prosecution could not cross-examine Scott. Scott asserts these comments prejudiced him to an unconstitutional degree, and further that the trial court's subsequent jury instructions only compounded the error: the trial court stated, "Now, ladies and gentlemen, you will remember that the mitigation that has been offered to you by the defendant is his unsworn statement. No evidence or testimony from other witnesses has been offered to you." Respondent does not argue that this ground for relief is procedurally barred.

Scott did raise this grounds for relief on direct appeal, and the Ohio court of appeals found it not well-taken:

> A prosecutor does not cause prejudicial error by arguing that the defendant's unsworn statement lacks the same credibility as sworn testimony subject to cross-examination.

> The prosecutor's argument in this case did not unfairly prejudice the defense. It asserted that the unsworn statement had less value as evidence than the earlier formal testimony of witnesses. It made no suggestion that the jury could draw an adverse inference from the defendant's decision not to testify.

> The court instructed the jurors during the earlier guilt phase of the trial that the defendant had a constitutional right not to testify. It directed them to draw no inference from his failure to testify. In the penalty phase of the trial, the court explained that the jurors had heard the defendant's unsworn statement but no evidence or testimony from other witnesses. The court then repeated the instructions about the defendant's constitutional right and the ju-

---

**13.** The Court adds that Scott's eighth and twelfth grounds for relief are also not well-taken on the merits. When a petitioner seeks relief through habeas corpus based on improper prosecutorial comments, it "is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wain-* *wright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (citations omitted). This question must be answered in light of the totality of circumstances in the case. *Lundy v. Campbell,* 888 F.2d 467, 473 (6th Cir.1989), *cert. denied,* 495 U.S. 950, 110 S.Ct. 2212, 109 L.Ed.2d 538 (1990). The Court concludes that, in this case, the prosecutor's comments to which Scott objects, while certainly objectionable, did not deny Scott due process or inject any fundamental unfairness into the trial.

rors' inability to draw any inference from his decision not to testify. Neither the prosecutor's argument nor the court's instructions about the unsworn statement unfairly prejudiced the defense. This claimed error lacks merit. *State v. Scott*, 1985 WL 9047 at * 10–11 (Ohio Ct.App. May 23, 1985) (citation omitted). The Ohio Supreme Court affirmed this conclusion. *State v. Scott*, 26 Ohio St.3d 92, 497 N.E.2d 55, 67–68 (1986).

This Court finds itself in agreement with the Ohio appellate courts that Scott's thirteenth ground does not present any error of constitutional dimension. "The prosecutor said nothing more than what the jury already knew to be true, namely, . . . that appellant did not [testify under oath]." *State v. Jenkins*, 15 Ohio St.3d 164, 15 O.B.R. 311, 473 N.E.2d 264, 309 (1984), *cert. denied*, 472 U.S. 1032, 105 S.Ct. 3514, 87 L.Ed.2d 643 (1985). Moreover, regarding "the alleged prejudicial effect of the court's instruction, [Scott's] negative inference argument is far too speculative upon which to premise a valid constitutional argument." *State v. Scott*, 26 Ohio St.3d 92, 497 N.E.2d 55, 68 (1986). Accordingly, the Court finds Scott's thirteenth ground for relief is not well-taken.

### E. Scott's Fourteenth, Sixteenth, and Eighteenth Grounds for Relief.

Scott's fourteenth, sixteenth, and eighteenth grounds for relief all refer to allegedly improper jury instructions given by the trial judge at the penalty phase of trial. Scott's fourteenth ground is that his death sentence is unconstitutional "because the trial judge instructed the jury that their death recommendation was not binding on the court." Scott's sixteenth ground is that his death sentence is unconstitutional "because the trial judge instructed the jury to exclude considerations of mercy." Scott's eighteenth ground is that his death sentence is unconstitutional "because the trial judge improperly in-

structed the jurors that they must unanimously recommend a life sentence." The respondent asserts that Scott has procedurally defaulted on all three of these grounds because Scott did not raise any objection to the challenged jury instructions at trial, thus violating the "contemporaneous objection rule" contained in Ohio R.Crim. Proc. 30(A).

Scott raised these three grounds for the first time on direct appeal, and the Ohio Supreme Court found that Scott had procedurally defaulted by not objecting to the challenged jury instructions at trial. *State v. Scott*, 26 Ohio St.3d 92, 497 N.E.2d 55, 64, 68, 69 (1986). Scott asserts, however, that the state supreme court did not "actually enforce the state procedural sanction," as required under the second prong of the *Maupin* test, because the court "forgave" the procedural bar and proceeded to examine his grounds on the merits. Scott notes that, in a federal habeas court, the "cause and prejudice standard is not applied . . . when the state court overlooks the procedural default and instead disposes of the issue on the merits." *McBee v. Grant*, 763 F.2d 811, 813 (6th Cir.1985).

It is questionable whether the Ohio Supreme Court truly overlooked Scott's procedural defaults and examined the merits of Scott's three grounds regarding jury instructions.[14] For example, with regard to Scott's fourteenth ground, the Ohio Supreme Court noted Scott's procedural default but also noted that Scott "may still argue that the instructions constitute[] plain error." *State v. Scott*, 497 N.E.2d at 64. Thus, the Ohio Supreme Court examined Scott's fourteenth ground for plain error, instead of applying a de novo review. The Ohio Supreme Court followed this same analysis in examining Scott's sixteenth ground, *id.* at 68, and arguably in examining Scott's eighteenth ground, as well, *id.* at 69. A plain error analysis is not tantamount to a review on the merits, so the Ohio Supreme Court did

---

**14.** The Ohio Court of Appeals did not invoke procedural default, instead finding that Scott's objections to the trial court's jury instructions at the sentencing phase of trial were not valid on the merits. *State v. Scott,* 1985 WL 9047 at *8.

not wholly overlook Scott's procedural default.

Scott also argues, however, that, even assuming the Ohio Supreme Court enforced the contemporaneous objection rule as a procedural bar by changing its level of review from de novo to plain error—so that the respondent passes the second step of the *Maupin* test—this Court should examine the merits of his fourteenth, sixteenth, and eighteenth grounds because the respondent cannot pass the third prong of the *Maupin* test. This prong requires that, before this Court may enforce a procedural bar, it must conclude "the state procedural forfeiture is an 'adequate and independent' state ground on which the state can rely to foreclose review of a federal constitutional claim." *Maupin,* 785 F.2d at 138. Scott argues that Ohio's contemporaneous objection rule is not an "independent" state ground because it is not independent of federal law.

The Sixth Circuit Court of Appeals has suggested it agrees with Scott on this point. In *Knuckles v. Rogers,* 1993 WL 11874 (6th Cir. Jan.21, 1993), the Court ruled as follows:

> it is clear that Ohio has a contemporaneous objection rule, and that the Ohio courts treat the failure to object to a claimed error as a procedural default. Ohio R.Crim. P. 52; *State v. Williams,*

51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364 (1977). Since Knuckles failed to object contemporaneously to the allegedly improper remarks, he violated Ohio's contemporaneous objection rule and committed a procedural default. However, the procedural default did not foreclose all consideration by the Ohio appellate court; the Ohio court examined the record to determine if the allegedly improper remarks were "plain error."

> The basic inquiry in the plain error analysis in Ohio is whether the defendant has been denied a "fair trial." Whether a person is denied a fair trial is a question to be resolved by applying principles of federal constitutional law. Therefore, we conclude that the Ohio appellate court's decision was not independent of federal law.

*Id.* 1993 WL 11874, at *2–3 (footnote omitted).[15]

■ Given the reasoning recited in *Knuckles,* this Court must conclude that Ohio's application of its contemporaneous objection rule in this case was not independent of federal law. As such, the respondent's assertion that Scott's fourteenth, sixteenth, and eighteenth grounds are procedurally barred cannot be upheld, under the *Maupin* test. Accordingly, the Court examines these grounds on the merits.[16]

---

**15.** The Second Circuit Court of Appeals agreed with the reasoning in *Knuckles.* In *Roy v. Coxon,* 907 F.2d 385, 390 (2nd Cir. 1990), the court stated that "even if the state court has addressed the questions of (a) whether there was error, and (b) whether the error was prejudicial, if these questions were answered in the context of plain-error analysis, the decision was not sufficiently a ruling on the merits to authorize the federal court to reach the merits." The court added, however, that this "conclusion does not ... end [the] inquiry, for in order to preclude federal review on the ground of procedural default, the state court's waiver ruling *must have rested on a state ground that is independent of federal law.*" *Id.* The *Roy* court thus proceeded to reach the merits of the petitioner's claim. Oddly, it was respondent who cited *Roy* in support of its procedural bar argument.

**16.** This Court's conclusion that Scott's eighteenth ground is not procedurally barred because respondent cannot pass the third prong of the *Maupin* test is more tenuous than the Court's similar conclusion regarding Scott's fourteenth and sixteenth grounds. This is because, unlike the fourteenth and sixteenth grounds, the Ohio Supreme Court did not clearly apply a plain error analysis to Scott's eighteenth ground, so the *Knuckles* reasoning regarding whether Ohio's contemporaneous objection rule is independent of federal law is less clearly applicable. But even if the respondent passes the third prong of the *Maupin* test on Scott's eighteenth ground, the respondent does not pass the fourth prong of the *Maupin* test. Scott has shown cause for his failure to object to the trial court's instruction—then-current Ohio Supreme Court precedent held that "in returning a sentence of life imprisonment under R.C. § 2929.03(D)(2), the jury's verdict must be

### 1. Scott's Fourteenth Ground.

With his fourteenth ground, Scott complains that one of the trial judge's instructions to the jury, during the penalty phase, had the effect of unconstitutionally diminishing the jury's responsibility for imposition of the death penalty. The challenged instruction is quoted below:

If all 12 members of the jury find, by proof beyond a reasonable doubt, that the aggravating circumstances which Jay Scott was found guilty of committing outweigh the mitigating factors, then you must return such finding to the Court. I instruct you as a matter of law that if you make such a finding, then you have no choice and must recommend to the Court that the sentence of death be imposed upon the defendant, Jay Scott. *A jury recommendation to the Court that the death penalty be imposed is just that—a recommendation.*

On the other hand, if . . . you find that the State of Ohio failed to prove that the aggravating circumstances which the defendant, Jay Scott, was found guilty of committing, outweigh the mitigating factors, then you will return your verdict reflecting your decision.

In this event, you will then proceed to determine which of two possible life imprisonment sentences to recommend to the Court. Your recommendation to the Court shall be one of the following: That Jay Scott be sentenced to life imprisonment with parole eligibility after 20 full years of imprisonment; or that Jay Scott be sentenced to life imprisonment with parole eligibility after 30 full years of imprisonment. *This particular recommendation which you make is binding upon the Court, and I, the Judge, must impose the specific life sentence which you recommend.*

Trial Tr. at 3173–74 (emphasis added). As Scott notes, this instruction draws a clear contrast between the jury's decision to recommend a sentence of death versus a decision to recommend a sentence of life imprisonment: a recommendation of death is not binding, while a recommendation of life imprisonment is.

Scott insists this instruction unconstitutionally misled the jury, because it impermissibly alleviated the jury's responsibility for its decision. As authority for his position, Scott cites *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). In *Caldwell,* the prosecutor "urged the jury not to view itself as determining whether the defendant would die, because a death sentence would be reviewed for correctness by the State Supreme Court." *Id.* at 323, 105 S.Ct. 2633. The *Caldwell* Court concluded that the defendant's death sentence was unconstitutional, because "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* at 328–29, 105 S.Ct. 2633. Scott relies on this language and argues that the trial court's instruction impermissibly led the jury to believe that final responsibility for determining whether Scott should suffer a death sentence lay with the judge, and not with it.

A critical difference between this case and *Caldwell,* however, is that, in *Caldwell,* "[t]he [prosecutor's] argument was inaccurate, both because it was misleading as to the nature of the appellate court's review and because it depicted the jury's role in a way fundamentally at odds with the role that a capital sentencer must perform." *Id.* at 336, 105 S.Ct. 2633 (plurality opinion); *id.* at 342, 105 S.Ct. 2633 (O'Connor, J., concurring) ("[i]n my view, the prosecutor's remarks were impermissible because they were inaccurate and misleading").[17]

unanimous." *State v. Jenkins* 15 Ohio St.3d 164, 473 N.E.2d 264, syllabus ¶ 10 (1984). As such, Scott reasonably believed a contemporaneous objection would be futile. Scott has also shown prejudice—as discussed below in Section VI.E.3, there exists a reasonable probability that, absent the incorrect instruc-

tion, the results of the sentencing proceeding would have been different. Thus, Scott is not procedurally barred from pursuing his eighteenth ground.

**17.** As the Supreme Court noted in *Romano v. Oklahoma,* 512 U.S. 1, 114 S.Ct. 2004, 129

The Supreme Court has carefully noted that it

> read[s] *Caldwell* as "relevant only to certain types of comment—those that *mislead* the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." *Darden v. Wainwright*, 477 U.S. 168, 184, n. 15, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Thus, "[t]o establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury *improperly* described the role assigned to the jury by local law." *Dugger v. Adams*, 489 U.S. 401, 407, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989); *see also Sawyer v. Smith*, 497 U.S. 227, 233, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990).

*Romano v. Oklahoma*, 512 U.S. 1, 114 S.Ct. 2004, 2010, 129 L.Ed.2d 1 (1994) (emphasis added). As Justice O'Connor notes in her controlling opinion in *Caldwell*, the Supreme Court has never held that "the Federal Constitution prohibits the giving of accurate instructions regarding post-sentencing procedures." *Caldwell*, 472 U.S. at 342, 105 S.Ct. 2633 (O'Connor, J., concurring).

In this case, the jury instruction that Scott challenges is in no way inaccurate or misleading. The version of Ohio Revised Code § 2929.03(D)(2) then applicable provided that:

> If the trial jury unanimously finds ... that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender. Absent such a finding, the jury shall recommend that the offender be sentenced to one of the following: ... life imprisonment with parole eligibility after serving twenty full years of imprisonment, or life imprisonment with

parole eligibility after serving thirty full years of imprisonment.

Ohio Rev.Code § 2929.03(D)(2). The statute goes on to state that if the jury "recommends that the offender be sentenced to life imprisonment with parole eligibility after serving twenty full years of imprisonment, or life imprisonment with parole eligibility after serving thirty full years of imprisonment, the court shall impose the sentence recommended by the jury upon the offender." *Id.* But "[i]f the trial jury recommends that the sentence of death be imposed upon the offender, the court shall proceed to impose sentence pursuant to" § 2929.03(D)(3). *Id.* This latter section provides that "if, after receiving ... the trial jury's recommendation that the sentence of death be imposed, the court finds, by proof beyond a reasonable doubt, ... that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, it shall impose sentence of death on the offender." Ohio Rev.Code § 2929.03(D)(3). Otherwise, the trial court had to impose life imprisonment with parole eligibility after serving twenty full years of imprisonment, or life imprisonment with parole eligibility after serving thirty full years of imprisonment. *Id.*

In other words, the jury instructions challenged by Scott are an accurate statement of Ohio law. "[I]f the challenged instructions accurately described the role of the jury under state law, there is no basis for a *Caldwell* claim." *Dugger v. Adams*, 489 U.S. 401, 407, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989); *Kordenbrock v. Scroggy*, 919 F.2d 1091, 1101 (6th Cir.1990) (en banc), *cert. denied*, 499 U.S. 970, 111 S.Ct. 1608, 113 L.Ed.2d 669 (1991). Accordingly, the Court finds Scott's fourteenth ground for relief is not well-taken.

L.Ed.2d 1 (1994), "Justice O'Connor supplied the fifth vote in Caldwell, and concurred on grounds narrower than those put forth by the plurality[; therefore,] her position is controlling." *Id.* at 9, 114 S.Ct. 2004 (citing *Marks*

*v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), and *Gregg v. Georgia*, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)).

### 2. Scott's Sixteenth Ground.

■ With his sixteenth ground, Scott complains that one of the trial judge's instructions to the jury, during the penalty phase, had the effect of unconstitutionally removing from the jury's consideration certain factors that, by law, a jury *must* consider in capital sentencing. The challenged instruction is quoted below:

> *You must not be influenced by any consideration of sympathy or prejudice.* It is your duty to carefully weigh the evidence to decide all disputed questions of fact, to apply the instructions of the Court to your findings, and to render your verdict accordingly. In fulfilling your duty, your efforts must be to arrive at a just verdict. Consider all the evidence and make your finding with intelligence and impartiality, *without bias, sympathy, or prejudice,* so that the State of Ohio and the defendant will feel that their case was fairly and impartially tried.

Trial Tr. at 3174–75 (emphasis added). Essentially, Scott objects to the two-fold instruction that the jurors should not allow "sympathy" to influence them, arguing that "sympathy" is precisely what mitigating factors are designed to invoke.

A death-sentenced defendant made a similar argument in *California v. Brown,* 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987), arguing that an instruction to the jury not to be swayed by "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" was unconstitutional. *Id.* at 542, 107 S.Ct. 837. The Supreme Court rejected this argument, noting that "[e]ven a juror who insisted on focusing on [the phrase 'mere sympathy'] in the instruction would likely interpret the phrase as an admonition to ignore emotional responses that are not rooted in the aggravating and mitigating evidence introduced during the penalty phase." *Id.* Here, the trial court did not warn simply against feelings of sympathy, but directed the jurors to "make your finding with intelligence and impartiality, without bias, sympathy, or prejudice, so that

the [parties] will feel that their case was fairly and impartially tried." Read in its entirety, this instruction similarly warns jurors to ignore emotional responses that are not rooted in the evidence, including those emotional responses that might dispose the jury *against* the defendant. Accordingly, the Court finds Scott's sixteenth ground for relief is not well-taken.

### 3. Scott's Eighteenth Ground.

■ With his eighteenth ground, Scott complains that one of the trial judge's instructions to the jury, during the penalty phase, had the effect of unconstitutionally increasing the likelihood that the jurors would return a recommendation of death. Specifically, Scott asserts the trial court incorrectly suggested that the jury's recommendation—of either death *or* life imprisonment—must be unanimous. The challenged instruction is quoted below:

> *If all 12 members of the jury find,* by proof beyond a reasonable doubt, that the aggravating circumstances which Jay Scott was found guilty of committing outweigh the mitigating factors, then you must return such finding to the Court. I instruct you as a matter of law that if you make such a finding, then you have no choice and must recommend to the Court that the sentence of death be imposed upon the defendant, Jay Scott.
>
> \* \* \* \* \* \*
>
> On the other hand, if after considering all of the relevant evidence raised at trial, the testimony, other evidence, the statement of Jay Scott, and the arguments of counsel, you find that the State of Ohio failed to prove that the aggravating circumstances which the defendant, Jay Scott, was found guilty of committing, outweigh the mitigating factors, then you will return your verdict reflecting your decision.
>
> In this event, you will then proceed to determine which of two possible life imprisonment sentences to recommend to the Court. \* \* \*
>
> \* \* \* \* \* \*

Now, ladies and gentlemen, let me, first of all, before we continue, before I read you what your verdict is, you see it is almost identical, and when I say "It is almost identical," to the forms that you have received before. It says, and I just picked them up the way they were, "Sentencing Proceeding" on the top, and it identifies the case, the case number, and then it says, "Verdict: We the jury in this case being duly empaneled and sworn, do find beyond a reasonable doubt that the aggravating circumstances which the defendant, Jay Scott, was found guilty of committing, are sufficient to outweigh the mitigating factors presented in this case."

"We, the jury, recommend that the sentence of death be imposed upon the defendant, Jay Scott," *and, again, signed by the foreman or forelady and all 12 of you must sign.*

The second form is: "We, the jury in this case being duly empaneled and sworn, do find that the aggravating circumstances which the defendant, Jay Scott, was found guilty of committing, are not sufficient to outweigh the mitigating factors present in this case."

"We, the jury, recommend that the defendant, Jay Scott, be sentenced to life imprisonment with parole eligibility after sentencing," and then there's blank with an asterisk which refers down and says, "insert in ink 20 or 30," whichever you decide, "full years of imprisonment," *and, again, the signatures, and the first line is reserved for the foreman or forelady, and the remainder of the eleven of you must sign that verdict form. It must be unanimous.*

\* \* \* \* \* \*

*After you have retired, first, select a foreman or forelady, and when all 12 of you—I repeat—12 of you agree upon a verdict, you will sign the verdict in ink, and advise the Court of this fact.* You will remain in the jury room until summoned back into the courtroom. When you return to the courtroom, your verdict will be returned to me, as you did before, and I will read it for you.

Trial Tr. at 3173–74, 3176–77, 3179 (emphasis added).

The statute upon which the trial judge relied in formulating these instructions is Ohio Rev.Code § 2929.03(D)(2), which, to repeat, provides in pertinent part:

If the trial jury unanimously finds ... that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender. *Absent such a finding,* the jury shall recommend that the offender be sentenced to one of the following: ... life imprisonment with parole eligibility after serving twenty full years of imprisonment, or life imprisonment with parole eligibility after serving thirty full years of imprisonment.

Ohio Rev.Code § 2929.03(D)(2) (emphasis added). This statute makes clear that a jury's recommendation of death must be unanimous. Less clear, but still reasonably discernible, is that a recommendation of life imprisonment need *not* be unanimous; rather, the jury should recommend life imprisonment if they are anything *other than* unanimously in favor of death. Thus, the jury must recommend life imprisonment if *either:* (1) the jurors unanimously agree that a death sentence is inappropriate; *or* (2) the jurors cannot all agree—they are split and deadlocked—on whether the death sentence is appropriate. It is *not* the law that the jury must be unanimous in its sentence recommendation, whether for life imprisonment or death. *See State v. Brooks,* 75 Ohio St.3d 148, 661 N.E.2d 1030, 1042 (1996) ("In Ohio, a solitary juror may prevent a death penalty recommendation by finding that the aggravating circumstances in the case do not outweigh the mitigating factors. Jurors from this point forward should be so instructed."); *State v. Springer,* 63 Ohio St.3d 167, 586 N.E.2d 96, 100 (1992) ("in cases where, as here, the jury becomes hopelessly deadlocked during its sentencing deliberations and is unable to unani-

mously recommend any sentence, including death, the penalty of death is clearly unauthorized and one of the two remaining (authorized) sentencing options must be imposed upon the offender by the trial court").[18]

In this case, the trial court correctly instructed the jury that a recommendation of death had to be unanimous. The trial court's instruction was incorrect, however, to the extent it stated that a recommendation of a life sentence also had to be unanimous. The trial court so instructed the jury twice: first, when discussing the verdict form the jury should use to return a recommendation of life imprisonment ("It must be unanimous," tr. at 3177); and second, when discussing the verdict forms generally, for either life imprisonment or death ("when all 12 of you—I repeat—all 12 of you agree upon a verdict," tr. at 3179). The trial court's instructions left no room for the jury to believe the court could accept anything other than a unanimous recommendation, and gave no direction to the jury as to the effect a jury split would have on the jury's prior determination of guilt, or on the sentence the trial court could or would then impose on Scott.

The effect of the trial court's faulty instructions in this case is similar to the effect of the faulty jury instructions in *Kubat v. Thieret*, 867 F.2d 351 (7th Cir. 1989), *cert. denied*, 493 U.S. 874, 110 S.Ct. 206, 107 L.Ed.2d 159 (1989). In *Kubat*, "Kubat's jurors were never expressly informed in plain and simple language that if even one juror believed that the death penalty should not be imposed, Robert Kubat would not be sentenced to death. On the contrary, the instructions emphasized unanimity." *Id.* at 373. This improper emphasis created a "substantial possibility that one or more of Kubat's jurors might have been precluded from granting mercy to Kubat because of a mistaken belief that the sufficiency of mitigating factors had to be found unanimously." *Id.* Because of this possibility, the Seventh Circuit Court of Appeals affirmed the grant of a writ of habeas corpus vacating the petitioner's sentence. *Id.* at 374.[19]

The Supreme Court has stated that "in reviewing death sentences, the Court has demanded even greater certainty that the jury's conclusions rested on proper grounds." *Mills v. Maryland*, 486 U.S. 367, 376, 108 S.Ct. 1860, 100 L.Ed.2d 384

**18.** It is notable that *Brooks* and *Springer* were decided *after* Scott's trial occurred. At the time the trial court gave its instructions, the only Ohio Supreme Court opinion on the issue of sentencing-jury unanimity stated that "in returning a sentence of life imprisonment under R.C. § 2929.03(D)(2), the jury's verdict must be unanimous." *State v. Jenkins* 15 Ohio St.3d 164, 473 N.E.2d 264, syllabus ¶ 10 (1984). Although one could argue that the Ohio Supreme Court's subsequent opinions appear to be directly contrary, the Ohio Supreme Court in *Brooks* characterized its ruling as one that "harmonized" *Springer* with *Jenkins*. *Brooks*, 661 N.E.2d at 1042. A fair reading of all of these cases, and of the statute that they interpret, reveals that *Brooks* did not alter the state of the law in Ohio, it simply clarified it.

**19.** It appears that the Sixth Circuit Court of Appeals would follow *Kubat*. In *Kordenbrock v. Scroggy*, 919 F.2d 1091 (6th Cir.1990) (en banc), *cert. denied*, 499 U.S. 970, 111 S.Ct. 1608, 113 L.Ed.2d 669 (1991), 4 members of a 13–member panel of the Sixth Circuit Court

of Appeals followed the *Kubat* analysis. *Id.* at 1109–10. The remaining panel members asserted that *Kubat* was factually distinguishable because: (1) the instructions in *Kubat* affirmatively stated the jury had to find mitigating factors unanimously, while (2) the instructions in *Scroggy* stated that finding an *aggravating* factor required unanimous agreement, but were silent regarding the need for unanimity in finding a *mitigating* factor. *Id.* at 1121 (Kennedy, J., dissenting). None of the panel members, however, suggested the legal conclusion in *Kubat*, on the facts presented there, was erroneous. *See also Austin v. Bell*, 126 F.3d 843, 849 (6th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1526, 140 L.Ed.2d 677 (1998) (granting partial writ of habeas corpus in death penalty case and remanding for resentencing on other grounds, but adding the serious concern that "the instruction on mitigating circumstances created a substantial possibility that the jury interpreted the instruction to prevent them from individually considering a mitigating circumstance unless they unanimously agreed on that circumstance," and citing *Kubat* ).

(1988). Unless this Court "can rule out the possibility that the jury may have rested its verdict on the 'improper' ground, [it] must remand for resentencing." *Id.* at 377, 108 S.Ct. 1860. "The risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty ... is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." *Id.* (citations and internal quotation marks omitted).

In this case, this Court finds there is a substantial possibility that the jury's recommendation of death rested upon an improper ground. The trial court's admonition that *any* recommendation must be unanimous, even a recommendation of life imprisonment, left the jurors unaware that "one juror could [have] block[ed] the death sentence if he or she believed there were sufficient mitigating circumstances." *Kordenbrock v. Scroggy,* 919 F.2d 1091, 1110 (6th Cir.1990) (en banc), *cert. denied,* 499 U.S. 970, 111 S.Ct. 1608, 113 L.Ed.2d 669 (1991); *see Kubat,* 867 F.2d at 373 ("there is a substantial possibility that one or more of [Scott's] jurors might have been [improperly] precluded from granting mercy to [Scott]"). The faulty jury instruction which created this mis-impression violated Scott's Fourteenth Amendment right to be free from deprivation of life without due process of law. Accordingly, the Court finds Scott's eighteenth ground for relief is well-taken.[20]

### F. Scott's Fifteenth Ground for Relief.

█ Scott's fifteenth ground for relief is that his death penalty is unconstitutional "because the trial judge improperly instructed the jury concerning mitigating circumstances and applied the same erroneous standards in his decision to impose the death penalty." Unlike the other penalty-phase jury instructions that Scott challenges (discussed immediately above), respondent does not assert that Scott has procedurally defaulted on this ground. The challenged instruction is quoted below:

> Now, mitigating circumstances include, but are not limited to, the nature and circumstances of the offense, the history, character and background of the offender, and any or all of the following factors, and these are taken directly from the statute and adopted by the Legislature: The defendant's level of intelligence and how that affected his judgment to get involved in criminal activity; the defendants level of intelligence and how that affected his judgment inside

**20.** The Court notes that its application here of the rule set out in *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), might be subject to the bar on retroactive application of new legal rules to cases on collateral review, as announced in *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion). Under *Teague,* a case that announces a new legal rule after the defendant's conviction became final should not be applied retroactively unless the rule falls within one of *Teague's* narrow exceptions. *See also Sawyer v. Smith,* 497 U.S. 227, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990) (discussing and applying *Teague*). Whether *Teague* would bar retroactive application of *Mills* is "a close and difficult question upon which the circuits are split." *Frey v. Fulcomer,* 132 F.3d 916, 920 n. 4 (3rd Cir.1997), *cert. denied,* — U.S. ——, 118 S.Ct. 2076, 141 L.Ed.2d 151 (1998). Compare *Williams v. Dixon,* 961 F.2d 448, 459 (4th Cir.1992), *cert. denied,* 506 U.S. 991, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992) (holding that *Mills* survives the *Teague* bar) with *Miller v. Lockhart,* 65 F.3d 676, 685–86 (8th Cir. 1995) (holding that a *Mills* challenge is subject to the *Teague* bar) and *Nethery v. Collins,* 993 F.2d 1154, 1162 (5th Cir.1993), *cert. denied,* 511 U.S. 1026, 114 S.Ct. 1416, 128 L.Ed.2d 87 (1994) (same). *See also DeShields v. Snyder,* 829 F.Supp. 676, 687–88 (D.Del. 1993) (concluding that *Mills* does not announce a "new rule" under *Teague* ). The Sixth Circuit Court of Appeals has not taken a position in this debate. Indeed, the issue was never addressed in *Kordenbrock,* despite substantial discussion of *Mills* and *Kubat* in the Court's various opinions. In any event, this Court need not reach the *Teague* retroactivity issue here, because the respondent failed to raise it; accordingly, the Court deems the issue waived. *See Williams,* 961 F.2d at 459 (finding waiver of this precise issue because "a state's failure to raise the issue of retroactivity below constitutes waiver of that defense").

and outside the delicatessen that day; the defendant's relative chronological and psychological age; the defendant's family upbringing and whether that affects his ability to make decisions and to project into the future; and any other factors which you find to exist from the evidence in mitigation of the sentence of death.

Trial Tr. at 3171.

Scott's only theory at the penalty phase of trial was residual doubt;[21] the only evidence Scott presented at the penalty phase was his own unsworn statement, where he asserted he did not commit the crime. Scott now argues that, because the trial judge did not instruct the jury that residual doubt was a proper factor to consider in mitigation, the jury came to wrongly believe that residual doubt was not a mitigating factor it could consider. Scott further argues that the trial court, itself, also failed to consider residual doubt as a mitigating factor, when it independently weighed the aggravating factors against the mitigating factors, pursuant to Ohio Rev.Code § 2929.03(D)(3). The Ohio Supreme Court found these arguments unconvincing. *State v. Scott,* 497 N.E.2d at 65–67.

 This Court also finds Scott's fifteenth grounds to be without merit. As to the first aspect of this ground, the trial court clearly instructed the jury that mitigating factors include *any* circumstance relevant to whether a death sentence was appropriate: "mitigating circumstances include, *but are not limited to,* the nature and circumstances of the offense, the history, character and background of the offender, and ... *any other factors* which you find to exist from the evidence in mitigation of the sentence of death." The trial court's failure to specifically enumerate the factor of residual doubt does not

create a concern of constitutional implications. "[T]he Constitution does not require a State to adopt specific standards for instructing the jury in its consideration of aggravating and mitigating circumstances." *Zant v. Stephens,* 462 U.S. 862, 890, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). As long as the jury instructions regarding aggravating and mitigating circumstances leave "no reasonable possibility that the jury misunderstands its role in the capital sentencing procedure or misunderstands the meaning and function of mitigating circumstances," no constitutional error is present. *Peek v. Kemp,* 784 F.2d 1479, 1494 (11th Cir.1986), *cert. denied,* 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986).

The Supreme Court recently reaffirmed these principles in *Buchanan v. Angelone,* 522 U.S. 269, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998), when it was "call[ed] on ... to determine whether the Eighth Amendment requires that a capital jury be instructed on the concept of mitigating evidence generally, or on particular statutory mitigating factors." *Id.* 118 S.Ct. at 758–59. In *Buchanan,* the trial court's instructions to the sentencing jury regarding the meaning and identity of mitigating factors were less precise than the instructions Scott's sentencing jury received. *See id.* 118 S.Ct. at 759 n. 1 (quoting the jury instructions). The defendant contended that these instructions "failed to provide the jury with express guidance on the concept of mitigation, and to instruct the jury on particular statutorily defined mitigating factors," *id.* at 761, and that "the Eighth Amendment ... requires the court to instruct the jury on its obligation and authority to consider mitigating evidence, and on particular mitigating factors deemed relevant by the State." *Id.* at 761.

---

21. A "residual doubt" theory involves presentation of "further evidence in an attempt to instill in the jury a reasonable doubt of guilt, with the apparent aim of persuading the jury that the death penalty should not be imposed where some doubt as to guilt remained." *State v. Apanovitch,* 33 Ohio St.3d 19, 514

N.E.2d 394, 402 (1987). The Supreme Court defined residual doubt as "a lingering uncertainty about facts, a state of mind that exists somewhere between 'beyond a reasonable doubt' and 'absolute certainty.'" *Franklin v. Lynaugh,* 487 U.S. 164, 188, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988).

The Supreme Court majority, however, disagreed, noting the Court had "never ... held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence." *Id.* The *Buchanan* Court stated:

By directing the jury to base its decision on "all the evidence," the instruction afforded jurors an opportunity to consider mitigating evidence. The instruction informed the jurors that if they found the aggravating factor proved beyond a reasonable doubt then they "may fix" the penalty at death, but directed that if they believed that all the evidence justified a lesser sentence then they "shall" impose a life sentence. The jury was thus allowed to impose a life sentence even if it found the aggravating factor proved.

*Id.* at 762. The Court concluded that "[t]he absence of an instruction on the concept of mitigation and of instructions on particular statutorily defined mitigating factors did not violate the Eighth and Fourteenth Amendments to the United States Constitution." *Id.* at 763.

Even more than did the trial court in *Buchanan*, Scott's trial judge instructed the jury regarding the concept of mitigation, gave examples of mitigating factors, and explained how to weigh mitigating factors in its death penalty deliberations. These mitigation instructions clearly meet constitutional requirements, as established by *Buchanan*. Indeed, the jury instructions to which Scott objects would apparently receive the approval of even the dissenters in *Buchanan*. Because the challenged instruction clearly explains to the jury its role in the penalty phase of the trial and how to identify and weigh mitigating circumstances, the first aspect of Scott's challenge fails.

Regarding the second aspect of Scott's eighteenth ground, Ohio Rev.Code § 2929.03(D)(3) states that "if, after receiving ... the trial jury's recommendation that the sentence of death be imposed, the court finds, by proof beyond a reasonable doubt, ... that the aggravating circum-stances the offender was found guilty of committing outweigh the mitigating factors, it shall impose sentence of death on the offender." The Ohio Supreme Court concluded that the trial court effectively weighed the mitigating factor of residual doubt, or "defendant's proclamation of innocence during the sentencing hearing," simply by "taking into account the jury's verdict" of guilt. *State v. Scott*, 497 N.E.2d at 66. The Ohio Supreme Court further found *independently* that Scott's "claim of innocence ... does not manifest a factor which may be said to outweigh the aggravating circumstance that [Scott], while in the act of attempting to commit armed robbery, shot and killed Vinnie Prince at a distance estimated to be less than twelve inches." *Id.* 497 N.E.2d at 67. This Court agrees that the trial court's independent weighing of the aggravating factors against the mitigating factors was not in error. Accordingly, the Court finds Scott's fifteenth ground for relief is not well-taken.

## G. *Scott's Twentieth Ground.*

Scott's twentieth ground for relief is that the statutory provisions governing the Ohio capital punishment scheme are facially unconstitutional, and that the death penalty in general is unconstitutional. Under this rubric, Scott sets out a long list of alleged constitutional flaws in Ohio's death penalty scheme. In some respects, this list of flaws reiterates other grounds addressed elsewhere in this opinion.

Although respondent asserts that Scott has procedurally defaulted on many of the flaws listed under this ground, a careful reading of Scott's briefs on direct appeal reveals that he did raise virtually all of these flaws, even if only in passing. Accordingly, the Court concludes Scott is not procedurally barred from asserting most of the flaws he lists in his twentieth ground.

Having concluded that Scott has not waived the bulk of his twentieth ground, however, the Court further finds

that none of the alleged flaws which Scott lists reveal any constitutional infirmity. In summary fashion, the Court lists each alleged flaw below, in italics, and states the reason Scott's argument is unpersuasive.

- *Ohio's scheme is unconstitutional because it vests uncontrolled discretion with the prosecutor in death penalty indictment decisions.* The Supreme Court explicitly rejected this argument in *Gregg v. Georgia,* 428 U.S. 153, 199, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

- *Ohio's scheme is unconstitutional because it allows an aggravating circumstance to merely repeat an element of the underlying crime of aggravated murder.* This argument is a repetition of Scott's second ground, which the Court rejected earlier in this Opinion.

- *Ohio's scheme is unconstitutional because it imposes a higher risk of death on capital defendants who exercise their right to trial.* The Ohio scheme is distinguishable from the statute discussed in *United States v. Jackson,* 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), in that "a sentence of death is possible *whether a defendant pleads to the offense* or is found guilty after a trial." *State v. Buell,* 22 Ohio St.3d 124, 489 N.E.2d 795, 808 (1986), *cert. denied,* 479 U.S. 871, 107 S.Ct. 240, 93 L.Ed.2d 165 (1986) (emphasis added).

- *Ohio's scheme is unconstitutional because it works as a mandatory death penalty statute, because it requires imposition of a death sentence if the sentencer unanimously finds the aggravating circumstances outweighed the mitigating circumstances.* The Supreme Court explicitly rejected this argument in *Blystone v. Pennsylvania,* 494 U.S. 299, 305, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990).

- *Ohio's scheme is unconstitutional because it does not require a capital-sentenced defendant to have the culpable mental state of a conscious desire to kill.* This is simply not true, as revealed by Ohio Rev.Code § 2903.01(D) [now (E)], which requires a mental state of specific intent and "purposely causing the death of another." It is also not true that the absence of this precise requirement would necessarily render Ohio's death penalty scheme constitutionally infirm. *See Tison v. Arizona,* 481 U.S. 137, 157–58, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) (holding that "the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.... Only a small minority of those jurisdictions imposing capital punishment for felony murder have rejected the possibility of a capital sentence absent an intent to kill, and we do not find this minority position constitutionally required").

- *Ohio's scheme is unconstitutional because it requires that, if the defendant requests a pre-sentence report, which might prove to contain inadmissible and prejudicial material, the report must be submitted to the sentencer.*[22] The applicable statute, Ohio Rev.Code § 2929.03(D)(1), states that a defendant may choose to have the trial court conduct a pre-sentence investigation and mental examination, after guilt is found, and the results must be reported to the sentencer for consideration when it weighs aggravating and

**22.** Essentially, Scott argues that the Ohio scheme effectively *prevents* a defendant from fully developing mitigating evidence, by making too risky any decision to do so. In Scott's view, if a defendant wishes to take advantage of the background and family material that would be developed during a pre-sentence report, he must risk the fact that the jury will also be exposed to any negative information a balanced report would contain, and this risk is unconstitutionally excessive.

mitigating factors. The statute does not, however, prohibit the trial judge from *excluding* from the sentencer's consideration any excessively prejudicial information contained in the presentence report, whether pursuant to an objection by the defendant or sua sponte. Moreover, because the defendant is given an *option* of requesting a pre-sentence report, and can choose to develop background information on his own, there appears nothing constitutionally infirm about the state providing the option, even if it carries with it some attendant risks or requires some level of strategic choice.

- *Ohio's scheme is unconstitutional because it does not require the State to prove the absence of mitigating factors.* The Supreme Court has found constitutional Ohio's method of having the sentencer weigh aggravating factors against mitigating factors. *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). Furthermore, although Ohio Rev.Code § 2929.03(D)(1) places the burden of *production* of evidence of mitigating factors on the defendant, the burden of *proof* that aggravating circumstances outweigh mitigating circumstances correctly remains with the State. The Supreme Court has clearly authorized this burden-shifting analysis. *See Walton v. Arizona*, 497 U.S. 639, 649–50, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) ("So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency").

- *Ohio's scheme is unconstitutional because it requires the sentencer not to*

*be. influenced by sympathy.* This argument is a repetition of Scott's sixteenth ground, which the Court rejected earlier in this Opinion.

- *Ohio's scheme is unconstitutional because it does not allow for adequate appellate review for proportionality and appropriateness, and Ohio appellate courts do not actually make any real review of proportionality or appropriateness.* The Ohio scheme provides that Ohio's appellate courts must determine "whether the sentence of death is appropriate" and "whether the sentence is excessive or disproportionate to the penalty imposed in similar cases." Ohio Rev.Code § 2929.05(A). To make this determination, the appellate courts not only weigh for themselves the aggravating and mitigating factors, but also compare other Ohio cases where the death penalty was imposed. *Scott complains that: (a) the appellate courts do not also compare other cases where the death penalty was available but not imposed; (b) the original sentencer should also be required to make an appropriateness determination; and (c) the reviews done by Ohio's appellate courts are so. cursory, they are meaningless.*[23] The simplest answers to these contentions are: (a) Ohio's scheme regarding appellate review is rational and exceeds constitutional requirements; (b) the original sentencer effectively does make an appropriateness determination when it weighs aggravating and mitigating factors; and (c) Scott's assertion that the appellate courts' reviews are cursory is conclusory—when a state appellate court expressly states that it *has* conducted a proportionality review, this Court may not assume that the review was inadequate (or did not really occur) merely because the state court did not de-

---

**23.** Scott notes that the Ohio Supreme Court has not found even one of over 120 death sentences it reviewed to be disproportionate.

Of course, this ignores to some extent the "weeding out" process done by lower appellate courts.

scribe in writing all aspects of its review.

- *Ohio's scheme is unconstitutional because it does not require the trial judge to identify the precise mitigating factors he weighed.* Scott points to no case law supporting the proposition that there exists any such constitutional requirement. So long as an appellate court can find anywhere in the record "the considerations which motivated the death sentence," there is no constitutional infirmity. *Gardner v. Florida,* 430 U.S. 349, 361, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (holding only that "the record on appeal [must] disclose to the reviewing court the considerations which motivated the death sentence," but not that the trial court identify the precise mitigating factors it weighed). Further, pursuant to Ohio Rev.Code § 2929.03(F) the trial judge must make specific written findings as to *whether* any mitigating factors exist, what aggravating circumstances the defendant committed, and why the aggravating circumstances outweigh any mitigating factors. "[T]hese findings serve to enhance the record available upon appellate review. In addition, the statutory requirement that the appellate court make an independent determination of sentence appropriateness is an additional safeguard against arbitrary imposition of the death penalty and is not merely the answer to a constitutional mandate of proportionality review." *State v. Buell,* 22 Ohio St.3d 124, 489 N.E.2d 795, 807 (1986), *cert. denied,* 479 U.S. 871, 107 S.Ct. 240, 93 L.Ed.2d 165 (1986).

- *Ohio's scheme is unconstitutional because it does not allow the sentencer to choose life imprisonment if the aggravating circumstances outweigh the mitigating circumstances.* The Supreme Court has long upheld the type of scheme used by Ohio to guide the discretion of the sentencer. *Gregg,* 428 U.S. at 197–98, 96 S.Ct. 2909. Adequate protections are built into the Ohio legislative scheme, moreover, to assure that the death penalty will not be imposed in an arbitrary or unthinking manner. First, while the jury's recommendation of a life sentence is binding upon the actual sentencer, a death sentence recommendation is not. The trial judge must independently reweigh all mitigating and aggravating factors before it may impose the death penalty. Further, the trial judge is expressly instructed to impose a sentence of death *only* where he or she determines by proof beyond a reasonable doubt that the aggravating factors outweigh the mitigating circumstances. This is hardly an unthinking process or one devoid of any reasoned exercise of discretion. *See Beuke v. Collin,* Case no. C1–92–507, slip op. at 327–28 (S.D.Ohio Oct. 19, 1995) (concluding that the state legislative scheme permitting a sentencer to ignore the reasoned results of this weighing process, and to refuse to impose a death sentence where the factors warrant it (as Scott contends this Court should mandate), would itself be constitutionally infirm because it would authorize an essentially arbitrary determination); *McDougall v. Dixon,* 921 F.2d 518, 519 (4th Cir. 1990) (holding that a sentencing jury "may not arbitrarily or capriciously *impose or reject* a sentence of death") (emphasis in original; citation omitted).

- *The death penalty is cruel and unusual punishment, especially when imposed via electrocution.* The Supreme Court rejected the argument that the death penalty generally is unconstitutional, in *Gregg,* 428 U.S. at 179–87, 96 S.Ct. 2909, and *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). Further, even if imposition of death *by electrocution* is somehow especially cruel and unusual, the Ohio scheme allows a death-sentenced defendant to choose execution by lethal injection. Ohio Rev.Code § 2949.22(B). Scott does not argue

that death by lethal injection is especially cruel and unusual.[24]

- *Ohio's scheme is unconstitutional because statistics show that, in Ohio, the death penalty is not imposed equally among different groups.* The Supreme Court explicitly rejected this argument in *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), noting that, to prevail on this ground, a petitioner must prove that the State legislature passed or maintained the death penalty *because of* its anticipated or demonstrated racially discriminatory effect—which Scott has not done here. Indeed, Scott has offered nothing which would support the conclusion, or even the inference, that race was a factor in his jury's sentencing recommendation or in the trial court's sentencing determination.

- *The death penalty is not the least restrictive means available to serve the State's interests.* The Supreme Court

- explicitly rejected this argument in *Gregg*, 428 U.S. at 175, 96 S.Ct. 2909.

- *Ohio's scheme is unconstitutional because it violates the Supremacy Clause and the Organization of American States Treaty.* Scott clearly did not make this argument on direct appeal. As Scott has not shown cause for his failure to make this argument on direct appeal, or any actual prejudice suffered by the alleged constitutional error, he has waived his opportunity to pursue this argument through a petition for habeas corpus.

- *Ohio's scheme is unconstitutional because it includes a flawed definition of reasonable doubt.* This argument is a repetition of Scott's eleventh ground, which the Court rejects later in this Opinion.

- *Ohio's scheme is unconstitutional because it allows the jury to believe it is not ultimately responsible for imposition of a death sentence.* This argument is a repetition of Scott's

24. Scott's argument that imposition of the death sentence *by electrocution* violates the Constitution is compelling. It is true that, over 100 years ago, the Supreme Court held that execution by electrocution does not violate the Eighth Amendment. *In re Kemmler*, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890). The Court, however, has not revisited this issue in over a century, despite its pronouncement that the Eighth Amendment "draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). It appears that at least four current Justices would like to consider this issue. *Clisby v. Alabama*, 514 U.S. 1093, 115 S.Ct. 1818, 131 L.Ed.2d 741 (1995) (Stevens, Ginsburg, and Breyer, JJ. dissenting from denial of certiorari); *Poyner v. Murray*, 508 U.S. 931, 113 S.Ct. 2397, 124 L.Ed.2d 299 (1993) ("The Court has not spoken squarely on the underlying issue since *In re Kemmler*, and the holding of that case does not constitute a dispositive response to litigation of the issue in light of modern knowledge about the method of execution in question") (Souter, Blackmun, and Stevens, JJ., dissenting from denial of certiorari). *But see In re Sapp*, 118 F.3d 460, 464 (6th Cir.1997) ("[t]he very practice of electrocution has been upheld by other courts within

the past year, and there is no argument even plausible that there are differences in the level of 'evolving decency' among the different circuits or states of the union, or over the last very few years"). The currently available evidence regarding whether electrocution is a humane, non-cruel means of carrying out a death sentence is clearly mixed. Although the grisly evidence recited by Scott does legitimately bring into question the constitutionality of imposition of death by electrocution, the Court concludes that Ohio's scheme of allowing Scott to instead choose death by lethal injection relieves any constitutional infirmity. The Court reaches this conclusion, moreover, despite Scott's argument that Ohio's "choice" scheme is itself unconstitutional because it imposes upon a defendant the "macabre" task of choosing the vehicle of his own death. Scott contends that "[t]he very concept of having a person choose the instrument by which the state will put him to death is both excessive and cruel." Traverse at 70. While such a choice must be extraordinarily difficult for any capital-sentenced defendant, the Court can discern no constitutional obligation upon the state to predetermine every capital defendants' form of death (with the attendant likelihood that a capital defendant will describe any method chosen as cruel and excessive).

fourteenth ground, which the Court rejected earlier in this Opinion.

In sum, the Court concludes that none of the alleged flaws in Ohio's death penalty scheme listed by Scott present any constitutional infirmity. Accordingly, the Court finds Scott's twentieth ground for relief is not well-taken.

### H. Scott's Twenty–First Ground.

■■■ Scott's twenty-first ground for relief is that even if the Ohio death penalty scheme is not facially unconstitutional, it is unconstitutional in the manner the Ohio courts actually applied it to him. With this ground, Scott relies heavily on several of the flaws discussed under his twentieth ground, especially the Ohio appellate court's failure to undertake a proportionality and appropriateness review. It is clear, however, that the Ohio Supreme Court did undertake a proportionality review and appropriateness review in Scott's case, and that these reviews were neither cursory nor irrational. *State v. Scott,* 497 N.E.2d at 65–67. For example, the Ohio Supreme Court carefully parsed the trial court's sentencing opinion to ensure it followed the requirements of Ohio Rev.Code §§ 2929.03(F) and 2929.04. *Id.* At 65–66. The Ohio Supreme Court then independently reviewed the evidence, weighed the relevant factors, and agreed with the trial court's conclusion. *Id.* 497 N.E.2d at 66–67. Simply, Scott received a fair and thorough review by Ohio appellate courts for proportionality and appropriateness. Accordingly, the Court finds Scott's twenty-first ground for relief is not well-taken.

### VII. Scott's Attacks on His Conviction.

The Court now addresses those of Scott's grounds that focus on the constitutionality of his conviction.

### A. Scott's First Ground For Relief.

■■■ Scott's first ground for relief is that his conviction was unconstitutional "because the trial judge told the prospective jurors that, according to newspaper reports, [he] and other men were involved in the murder." Specifically, during voir dire, the trial court made the following statements in front of the panel of prospective jurors:

THE COURT: Now, ladies and gentlemen, I have given you about as much as the Court really knows about this case, and there has been some—I know, some publicity or notoriety about it at the time it occurred. I only know that because I happened to see an article printed in the newspaper at the time. You know that the victim is Vinnie Prince, and it's the Court's understanding that she was a storekeeper, and that the allegations concerning the robbery apparently occurred at her store.

Mr. Gerstenslager, do you have an idea of the neighborhood in which the store—the address of the store; I don't—

GERSTENSLAGER: 84th and Quincy.

THE COURT: 84th and Quincy. <u>Not only was Mr. Scott—at least from the newspaper reports that I think that I had read—was involved in this, there were three other—</u>

EISNER: Objection.

THE COURT: —individuals who—pardon?

EISNER: Your honor, I object.

THE COURT: Come to the sidebar.

[A sidebar conference was held off the record, and the Court then went back on the record.]

THE COURT: I think that, ladies and gentlemen, just so I can be a little bit more precise, the newspaper, the media coverage, I think, indicated that there were four individuals who ultimately had been accused of this robbery, and ultimately the killing of the victim, Vinnie Prince. Other than that, I really don't know an awful lot more about it.

The question that I now place to any of you, all of you, and I'd like to see a showing of hands, is: Does anybody remember reading about this incident?
* * *

Trial Tr. at 1009–10.

Shortly after the trial court made these remarks, the court excused the panel for lunch. Scott's counsel then urged the court to "reiterate" that it had no opinion on Scott's guilt. Trial Tr. at 1020–21. The prosecutor responded by suggesting that Scott should either move for a mistrial or conduct voir dire on "what [the jurors'] thoughts, if any, on [the court's] comment would be." *Id.* at 1022. The trial court decided it would give a curative instruction "reiterating" that it had no opinion on Scott's guilt. Immediately after the panel returned from lunch, however, Scott

moved for a mistrial on the basis of the judge's comments, and the prosecutor "reluctantly join[ed] in with the motion of the defense." *Id.* at 1034. The court overruled the motion, stating it would "give [the panel] an instruction concerning the deliberation, and the utilization of evidence, and the Court is going to ask, specifically during voir dire, and may do so immediately after he gives this instruction, as to whether or not anybody ... [has] been affected by any newspaper reports .... " *Id.* at 1034–35. The trial court then proceeded to give the following instruction, before resuming voir dire:

> * * * any impression that you might take as to how this case should be decided from anything that is said or done by the Court during trial, you are required by law to erase from your mind, and be guided wholly and solely by the evidence which is introduced at trial.
>
> * * * you must base your conclusion only upon the evidence introduced at trial, and, again, I say you must not take any impression from anything I have done or said as to what your decision should be ....

*Id.* at 1035–36. Following this instruction, the trial court asked the panel, "Does anybody have any difficulty setting aside anything that you might have heard about this case?", and received no affirmative answers.

Scott asserts that the trial court's comments deprived him of a fair trial, because the panel "could reasonably have interpreted and applied the [judge's] comment" to mean that "based on what he had read in the newspapers, the judge believed [Scott] was a participant in the crime." *Scott v. Ohio,* 480 U.S. 923, 924, 107 S.Ct. 1386, 94 L.Ed.2d 699 (1987) (denying certiorari) (Marshall, J., dissenting). Like Justice Marshall, Scott concludes that "[b]efore the jury had even heard any of the evidence, the judge had effectively become a witness against petitioner." *Id.* The respondent does not argue that Scott is procedurally barred from pursuing this ground.

The Court finds Scott's first ground particularly troublesome, especially because: (1) the prosecution joined Scott's motion for mistrial; and (2) as Justice Marshall noted, an easy remedy of any error was "close at hand"—calling a new venire. Nonetheless, although it is a "close call," the Court concludes Scott was not deprived of an unfair trial by virtue of the trial court's comments regarding the newspaper coverage. The trial judge's comments were made in the context of inquiring whether any panel members had read or heard any news reports about Scott or. the murder; the judge's comments served as much or more to note that even *he* had read such reports, than to state any personal belief regarding Scott's guilt. Compare *Ouercia v. United States,* 289 U.S. 466, 472, 53 S.Ct. 698, 77 L.Ed. 1321 (1933) (cited by Justice Marshall in his dissent from the denial of Scott's petition for writ of certiorari) (*the trial judge* "in a sweeping denunciation repudiated as a lie all that the accused had said in his own behalf") with *Scott v. Ohio,* 480 U.S. 923, 924, 107 S.Ct. 1386, 94 L.Ed.2d 699 (1987) (denying certiorari) (Marshall, J., dissenting) ("the judge actually reported to the jurors *the media's conclusion* that petitioner was guilty").

It is true that "some errors are so fundamental that no instruction can undo the damage they cause," *Scott v. Ohio,* 480 U.S. at 924, 107 S.Ct. 1386 (Marshall, J., dissenting), but this Court does not believe the trial judge's error during voir dire in this case rises to that level. The trial judge immediately instructed the panel that they should be guided solely by the evidence, and not any impression they had of what the judge thought. The panel affirmed they could put out of their mind anything they had read or heard in the news. Indeed, even if a panel member had *actually read* a newspaper article stating that Scott had been arrested for "being involved" with the crime, that would not be grounds for dismissal for cause. *See Patton v. Yount,* 467 U.S. 1025, 1033–34, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984) (uphold-

ing a conviction where virtually all the jurors had read adverse pretrial publicity about the defendant); *see also United States v. Peters*, 754 F.2d 753, 762 (7th Cir.1985) (reciting studies showing that, in a capital case, jurors can ignore pretrial publicity to which they were exposed and reach a verdict solely on the basis of evidence adduced at trial). For the same reason, the Court cannot conclude that, in this case, a potential juror could not render a fair verdict merely because the trial judge stated he had read reports that Scott was involved in the crime. This is especially true because the prospective jurors gave assurances of impartiality, and this Court must give "special deference" to the trial judge's conclusion that those assurances were accurate. *Yount*, 467 U.S. at 1037 n. 12, 104 S.Ct. 2885.

In sum, the Court agrees with Scott that the trial judge's comment to the jury venire about what he read in a newspaper report was error, and was a particularly unfortunate error given the readily available cure for any prejudice which may have resulted from that comment. The Court concludes, however, that this error does not rise to the level of a constitutional infirmity. Accordingly, the Court finds Scott's first ground for relief is not well-taken.

### B. *Scott's Seventh Ground For Relief.*

■■■ Scott's seventh ground for relief is that his conviction and death sentence were both unconstitutional "because prospective jurors who expressed any reservation about the death penalty were excused while jurors favoring the death penalty in homicide cases were retained." Although this ground initially might appear directed only at attacking the constitutionality of Scott's sentence, and not his conviction, Scott implicitly contends that a jury which tends to favor the death penalty in homicide cases is also more likely to

find guilt. The respondent does not argue that Scott is procedurally barred from arguing this ground.

The Supreme Court has ruled that "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment ... is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (citation and internal quotation marks omitted). This standard "does not require that a juror's bias be proved with 'unmistakable clarity.'" *Id.* When applying this standard, a habeas Court must generally pay "deference ... to the trial judge who sees and hears the juror." *Id.* at 426, 105 S.Ct. 844.

Scott first complains that the trial court improperly excluded four prospective jurors who expressed reservations about imposing the death penalty. The record reflects that three of these four potential jurors did not merely express vague discomfort with the thought of imposing a death sentence, they explicitly stated they could or would *not* make a recommendation of death. *See State v. Scott*, 497 N.E.2d at 61 (quoting these statements). The trial judge certainly had a reasonable basis to believe that these three panel members had views that could substantially impair the performance of their duties as jurors: they expressly indicated an unwillingness to follow the law, regardless of the facts. The record further reflects that the fourth potential juror was not dismissed because of her death penalty views; rather she was dismissed because of the impending marriage of her daughter. Trial tr. at 222.[25] Accordingly, this aspect of Scott's seventh ground for relief is not well-taken.

---

**25.** The fourth dismissed potential juror, Ms. Funtash, did also explicitly state that she could or would not make a recommendation of death. Trial Tr. at 217–18. Thus, the trial court had an additional, valid basis for dismissal, because there again existed a reasonable basis to believe Ms. Funtash had views that could substantially impair her performance as a juror.

Scott also complains of the converse problem—that the trial court improperly refused to dismiss four prospective jurors who expressed a preference for imposing the death penalty. This complaint, however, rings hollow. The trial judge *did* dismiss for cause three of the four jurors about whom Scott complains, for other reasons, and both sides *agreed* to the dismissal of two of these three. Further, Scott excused the fourth with a peremptory challenge, and "did not exhaust his peremptory challenges before expressing satisfaction with the jury." *State v. Scott,* 1985 WL 9047 at *6. Scott cannot show that "even one" juror was wrongly included in his jury. *See Morgan v. Illinois,* 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) ("[i]f even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence"). Accordingly, the Court finds Scott's seventh ground for relief is not well-taken.

### C. *Scott's Ninth Ground For Relief.*

■ Scott's ninth ground for relief is that his conviction was unconstitutional because it was "obtained with evidence which was insufficient as a matter of law." Scott notes that the only specification that made him death-eligible was "caus[ing] the death of another ... while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit Aggravated Robbery." Scott then argues that: (1) for the capital charge to stand, the prosecution had to prove beyond a reasonable doubt that Scott committed or attempted to commit aggravated robbery; and (2) there was insufficient evidence to prove Scott committed or attempted to commit aggravated robbery, because nothing was taken from the V & E Delicatessen, Scott entered the store with

money, and co-defendant O'Neal testified that there had been no discussion of robbery before they arrived at the store. The respondent does not argue that Scott is procedurally barred from pursuing this ground.

The standard a habeas court must apply to claims of insufficient evidence was set out by the Supreme Court in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979): "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319, 99 S.Ct. 2781. It is clear that, in this case, a rational jury could find that, when Scott killed Prince, he was committing or attempting to commit aggravated robbery, or was fleeing immediately afterwards. As the Ohio Supreme Court noted, "under R.C. § 2911.01, we note that an attempt to commit armed theft constitutes aggravated robbery." *State v. Scott,* 497 N.E.2d at 64. Scott's attempt to commit armed theft "is evidenced by the secretive manner in which Jones parked his car around the corner after dropping off [Scott] and O'Neal. Of further relevance is the fact that [Scott] was aware of a pending robbery charge against him upon his apprehension." *Id.* This Court agrees with the Ohio Supreme Court that this evidence "provides an ample basis to support the jury's verdict in this regard." *Id.*[26] Accordingly, the Court finds Scott's ninth ground for relief is not well-taken.

### D. *Scott's Tenth Ground For Relief.*

Scott's tenth ground for relief is that his conviction was unconstitutional "because the trial judge refused to give several essential jury instructions." Scott asked the

---

**26.** The Ohio Supreme Court also noted the evidence that "[i]n a signed statement to the police, Danny Jones repeatedly admitted that the motive for going to the V & E Delicatessen was to perpetrate an armed robbery of that establishment, although he later attempted to recant this assertion at trial." *State v.*

*Scott,* 497 N.E.2d at 64. As Scott notes in his post-hearing brief, however, Jones's written statement was never entered into evidence. Brief at 7. Still, even ignoring Jones's written statement, the other evidence introduced at trial provides an ample basis to support the jury's verdict.

trial court to instruct the jury on the credibility of co-defendant informers, drug-addicted informers, and accomplices. The reason for this request was that Danny Jones and Edward O'Neal testified against Scott, and both were co-defendant informers and also accomplices. Also, Ricky Tramble testified against Scott as an informer, and admitted under oath that he was addicted to Demerol and Talwin at the time of Scott's crime. Trial Tr. at 2466–67.[27]

The specific jury instructions that Scott unsuccessfully requested are as follows:

You have heard testimony from a person who admitted being an accomplice to the crime charged. You should consider such testimony with greater caution than that of an ordinary witness. You should consider, in addition to the standards you would apply in evaluating the testimony of any other witness, whether the accomplice's testimony is supported by other evidence.

\* \* \* \* \* \*

You have heard testimony that Danny Jones and Edward O'Neal have received a favorable plea bargain agreement in connection with this case. You should examine Danny Jones and Edward O'Neal's testimony with greater caution than that of ordinary witnesses. In evaluating each such person's testimony, you should consider the extent to which it may have been influenced by the receipt of this plea bargain agreement from the state.

\* \* \* \* \* \*

If an informer is also a narcotics addict, there are additional reasons why his testimony should be considered with great care. An addict has a constant need for a supply of drugs and for money to support his habit, and also may have abnormal fear of imprisonment in which his supply of drugs might be cut off. These are special circumstances

which you may consider in weighing testimony of this kind. You of course may give the testimony such weight as you think proper, after considering all relevant circumstances.

Instead of giving these requested jury instructions, however, the trial court gave only general instructions regarding credibility of witnesses. The trial court's instruction was as follows:

Now, during the trial, you heard considerable discussion as to the actions of other persons. If they acted improperly, charges could be brought against them, but the only person on trial here is the defendant, and the sole purpose of this lawsuit is to determine whether the defendant is guilty or not guilty. It is not to determine the guilt or the innocence of other persons on other charges; however, in weighing the testimony, you may consider their motive as going to the weight of their testimony, but we are only trying the case of this defendant.

\* \* \* \* \* \*

Now, an accomplice is one who purposely and knowingly assists and joins another person in the commission of a crime. The testimony of witnesses whom you find to be accomplices should be considered together with all the other facts and circumstances in evidence, and by applying the general rules of credibility of witnesses, you will determine if his testimony is worthy of belief; whether Danny Jones and Edward O'Neal were accomplices, and the weight that you give to their testimony are matters that you must determine.

The testimony of witnesses whom you find to be accomplices should be considered the same as other witnesses; however, no person, that is, the defendant, shall be found guilty of criminal charges only upon the testimony of accomplices. The testimony of accomplices must be

27. Demerol and Talwin are narcotic painkillers. Although Tramble admitted he was addicted to these drugs at the time he spoke with O'Neal, Streeter, Jones, and Scott, just after Scott killed Prince, Tramble apparently was not addicted to the drugs at the time he gave his testimony at trial, given that he was then incarcerated. Trial Tr. at 2423.

supported by other credible, believable evidence.

Trial Tr. at 3010–12.

■ First, regarding Scott's requested instruction about the credibility of drug-addicted informers, this instruction is only appropriate if the witness is addicted at the time of trial. *United States v. Howard,* 590 F.2d 564, 570 (4th Cir.1979), *cert. denied,* 440 U.S. 976, 99 S.Ct. 1547, 59 L.Ed.2d 795 (1979) ("no foundation was laid for the requested instruction, since there was no evidence that any of the witnesses were still addicted to narcotics at the time of trial"). Because there is no evidence that Tramble was addicted when he testified, and no possibility that an "abnormal fear of imprisonment" could then affect his testimony (because he was already incarcerated), the trial court's refusal to give the requested instruction was proper.

■ Regarding the requested instructions concerning accomplices and co-defendant informers, "[a]lthough the giving of an accomplice or informant credibility instruction is largely within the discretion of the trial court, there are instances in which the defendant is entitled to such an instruction." *United States v. Gonzalez,* 491 F.2d 1202, 1207 (5th Cir.1974); *see also United States v. McCabe,* 720 F.2d 951, 955 (7th Cir.1983) (such instructions are "preferred when accomplices testify against defendants, due to the inherent unreliability of this testimony, but the failure to give such an instruction is not [automatically] reversible error"). Generally, a trial court should give jury instructions regarding the credibility of accomplices and/or informants if the defendant requests such instructions and "the accomplice [or informant] testimony is not supported by a minimum amount of corroboration." *McCabe,* 720 F.2d at 956. If there is insufficient corroboration, the failure to give the requested instructions may be error.

The error, however, does not necessarily mean an *appellate* court (as opposed to a habeas court) should reverse. For example, if "the jury was made aware of the interests of the accomplices [and/or informants] during the various phases of the trial, such as direct examination, cross examination, closing argument, or through another jury instruction regarding witness credibility," then the errant failure to give the requested instruction is not *reversible* error. *Id.* at 957. Further, there is no reversible error if "[t]he instructions alerted the jury to the various considerations that it should take into account in weighing testimony, and [the jury] had an ample basis for rejecting the testimony of the accomplice witnesses if it . . . [chose] to do so." *United States v. Carr,* 5 F.3d 986, 992 (6th Cir.1993). Of course, the standard for showing a jury instruction was *constitutional* error in a habeas proceeding "is even greater than the showing required to establish plain error on direct appeal." *Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977). "The question in such a collateral proceeding is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even universally condemned." *Id.* (citations and internal quotation marks omitted). Moreover, a habeas petitioner's "burden is especially heavy [when] no [affirmatively] erroneous instruction was given . . . . An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Id* at 155, 97 S.Ct. 1730.

■ In this case, trial counsel made the jury aware that O'Neal and Jones: (1) were Scott's accomplices; (2) had informed law enforcement authorities about their and Scott's roles; and (3) obtained plea agreements. Thus, the issue of the level of reliability of O'Neal's and Jones's testimony was clearly brought to the attention of the jury.[28] Furthermore, the trial

---

**28.** See for example, the trial transcript at 2948–52, where Scott's trial counsel, in closing argument, argues that O'Neal lied about Scott's role (and possibly his own) in exchange for a plea agreement.

court: (1) cautioned the jury generally that "[i]n considering the credibility of witnesses, you will [consider] ... each witness['s] ... interest and bias, if any," tr. at 3007; (2) instructed that, "in weighing the testimony" of witnesses who had committed crimes, "you may consider their motive as going to the weight of their testimony," tr. at 3010; and (3) cautioned that "[t]he testimony of accomplices must be supported by other credible, believable evidence," tr. at 3012. While the instructions requested by Scott might be "preferred," *McCabe*, 720 F.2d at 955, the trial court's failure to give them did not rise to the level of reversible error. All the more so did the trial court's failure not deprive Scott of a fair trial. Accordingly, the Court finds Scott's tenth ground for relief is not well-taken.

### E. Scott's Eleventh Ground For Relief.

■■■■ Scott's eleventh ground for relief is that his conviction was unconstitutional "because the trial judge provided the jury with an erroneous definition of 'reasonable doubt.'" The respondent argues that Scott is procedurally barred from raising this ground, because Scott did not object to the trial court's reasonable doubt jury instruction at the time of trial. The Court notes, however, that the Ohio Supreme Court has stated, in another case, that it "addressed the merits" of this ground. *State v. Van Gundy*, 64 Ohio St.3d 230, 594 N.E.2d 604, 607 (1992) ("[w]hile it is true that this court, in *Scott*, stated that '* * * this instruction must be reviewed under the plain error standard,' we nevertheless addressed the merits of the claim"). Thus, this Court concludes Scott is not procedurally barred from asserting his eleventh ground.

The specific jury instructions that Scott challenges are as follows:

Now, the legislature of Ohio has specifically established the meaning of the term "reasonable doubt," and I will read that definition to you: "Reasonable doubt is present when, the jurors, after they have carefully considered and compared all evidence, cannot say they are

firmly convinced of the truth of the charge. It is a doubt based upon reason and common sense." Reasonable doubt is not mere possible doubt, because everything relating to human affairs or dependent upon moral evidence is open to some possible or imaginary doubt.

"Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his affairs."

All of the evidence should be examined carefully and conscientiously by you, and, if after a full and impartial consideration of all the evidence, you are firmly convinced beyond a reasonable doubt of the truth of the charge or charges, then the State has proved its case and you must find the defendant guilty.

If you are not firmly convinced of the truth of the charge, then the State has not proved its case and you must find the defendant not guilty.

Trial Tr. at 3001–02. The definition read by the trial judge in the first two quoted paragraphs above is taken from Ohio Rev. Code § 2901.05(D)(1).

Scott argues both that: (1) the definition of reasonable doubt contained in Ohio Rev. Code § 2901.05(D)(1) unconstitutionally dilutes the true reasonable doubt standard; and (2) the trial court's additional instructions also unconstitutionally diluted the true reasonable doubt standard. Scott insists that, due to this dilution, "a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause." *Cage v. Louisiana*, 498 U.S. 39, 41, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). Specifically, Scott asserts that: (1) the trial court's repeated use of the words "firmly convinced" had the effect of lowering the standard to one of clear and convincing evidence; and (2) the statutory definition is faulty because "the charge should have been in terms of the kind of doubt that would make a per-

son hesitate to act, rather than the kind on which he would be willing to act." *Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954) (citation omitted).[29]

It is true that the "willing to act" language used in Ohio's definition of reasonable doubt has been criticized. *See Monk v. Zelez*, 901 F.2d 885, 889–90 (10th Cir. 1990) (and cases cited therein). It is also true that the "firmly convinced" language of the trial court's instructions tends to hint at the lower "clear and convincing" standard. The question this Court must answer, however, is not whether the trial court's definition of reasonable doubt could have been better, but whether the "instruction by itself so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977). Put differently, this Court must assess whether the trial judge's instruction "could mislead the jury into finding no reasonable doubt when in fact there was some." *Holland*, 348 U.S. at 140, 75 S.Ct. 127; *Monk*, 901 F.2d at 890.

The Court concludes that, read as a whole, the challenged instruction does not impermissibly dilute the reasonable doubt standard required by the Constitution. The Sixth Circuit Court of Appeals has concluded that the statutory definition of "reasonable doubt" provided in Ohio Rev. Code § 2901.05(D)(1) does not offend due process. *Thomas v. Arn*, 704 F.2d 865, 867–69 (6th Cir.1983) (denying writ of habeas corpus). The trial court's additional instructions essentially repeat the statutory definition, and cannot be construed as misleading. Simply, the "reasonable doubt" instruction given by the trial judge did not infect Scott's trial. Accordingly, the Court finds Scott's eleventh ground for relief is not well-taken.

### F. Scott's Seventeenth Ground For Relief.

Scott's seventeenth ground for relief is that his conviction was unconstitutional "because the trial judge failed to instruct the jury that it must make a specific finding as to the specific intent to kill." The respondent does not argue that Scott is procedurally barred from raising this ground.

■■■ In support of this ground, Scott notes that Ohio Rev.Code § 2903.01(D) provides that "no person shall be convicted of aggravated murder unless he is *specifically found* to have intended to cause the death of another." (Emphasis added). Scott argues that this clause requires a jury to *specifically* find that he *intentionally* caused Vinnie Prince's death, and that the trial judge's failure to submit a special interrogatory to the jury was error. Scott concedes that this is a matter of state procedure, but notes that state laws guaranteeing a defendant certain procedural rights may create liberty interests protected against arbitrary deprivation by the due process clause of the Fourteenth Amendment. *See Hicks v. Oklahoma*, 447 U.S. 343, 346, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980) (when "a State has provided for the imposition of criminal punishment in the discretion of the trial jury, it is not correct to say that the defendant's interest in the exercise of that discretion is merely a matter of state procedural law. The defendant in such a case has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion, and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State.") (citation omitted).

---

**29.** *See, e.g., Scurry v. United States*, 347 F.2d 468, (D.C.Cir.1965), *cert. denied*, 389 U.S. 883, 88 S.Ct. 139, 19 L.Ed.2d 179 (1967) (finding proper an instruction that reasonable doubt was "such a doubt as in the graver, more important transactions of life would cause an ordinary and prudent person to hesitate and pause," but finding improper an instruction that "to establish proof beyond a reasonable doubt, the evidence must be such that you would be willing to act upon it in the more important affairs of your own life").

■ This case is distinguishable from *Hicks*, however, because the State of Ohio has *not* guaranteed criminal defendants who are accused of aggravated murder that a jury must enter a special verdict regarding intent. After examining the legislative intent behind Ohio Rev.Code § 2903.01(D), and long before Scott went to trial, the Ohio Supreme Court concluded that "a capital defendant is not entitled to a special verdict on the question of intent to kill at the guilt phase of a capital prosecution." *State v. Jenkins,* 15 Ohio St.3d 164, 473 N.E.2d 264, 306 (1984), *cert. denied,* 472 U.S. 1032, 105 S.Ct. 3514, 87 L.Ed.2d 643 (1985). Rather, Ohio Rev. Code § 2903.01(D) was enacted to ensure defendants were not "sentenced to death even though they did not participate in the actual killing, lacked the specific intent to kill, [or] acted only as aiders and abettors to crimes other than murder." *Id.*

There is no question in this case that the trial court: (1) instructed the jury that "purpose to kill is an essential element of the crime of aggravated murder;" and (2) explained the concept of specific intent. Trial Tr. at 3013. Scott complains only that the jury did not make an explicit finding, via a special verdict, that he acted with the required mens rea. Given that Scott has no right to, or legitimate expectation of, a special verdict guaranteed by state procedural law, he certainly has no right to a special verdict guaranteed by the Fourteenth Amendment. Accordingly, the Court finds Scott's seventeenth ground for relief is not well-taken.

### G. Scott's Nineteenth Ground For Relief.

Scott's nineteenth ground for relief is that his conviction was unconstitutional "because the Ohio Court of Appeals and the Ohio Supreme Court applied the improper standards of review in denying relief for federal constitutional violations."

Specifically, Scott asserts the Ohio courts, on direct appeal: (1) should have assessed not only the individual errors he alleged, but also the *cumulative* impact of the alleged errors; and (2) should not have applied a harmless error analysis.

■ The respondent argues Scott is procedurally barred from raising at least the first aspect of this ground, because he did not assert on direct appeal that he was deprived of a fair trial through cumulative error. The Court finds this argument is well-taken. Scott did not assert in either the Ohio Court of Appeals or the Supreme Court any "cumulative error" grounds. Scott has not shown cause for his failure to make this argument on direct appeal, nor any actual prejudice suffered by the alleged constitutional error, so he has waived his opportunity to pursue this argument through habeas corpus.

■ Furthermore, this ground is not well-taken on the merits.[30] The Sixth Circuit Court of Appeals has held that "regardless of whether each of a [habeas] petitioner's alleged errors, standing alone, would require [a finding of] deprivation of due process, [a court] may look to whether the cumulative effect of the errors was such that the petitioner was denied fundamental fairness." *McKinnon v. State of Ohio,* 1995 WL 570918 at *12 (6th Cir. Sept.27, 1995). In making this review, however, a court "should evaluate only the effect of matter determined to be error, not the cumulative effect of non-errors." *Id.* (quoting *United States v. Rivera,* 900 F.2d 1462, 1471 (10th Cir.1990)); *see Derden v. McNeel,* 978 F.2d 1453, 1458 (5th Cir.1992), *cert. denied,* 508 U.S. 960, 113 S.Ct. 2928, 124 L.Ed.2d 679 (1993) (the court must examine the cumulative effect of errors, not merely "adverse events"). Further, "the error complained of must not be have been procedurally barred from

---

**30.** A *very* lenient reading of Scott's briefs on direct appeal allows the conclusion that Scott did raise the cumulative error argument in state court, in that he occasionally asserted that his alleged errors, especially "in combi-

nation" with other alleged errors, worked to deprive him of a fair trial. Thus, to be thorough, the Court addresses Scott's "cumulative error" argument on the merits, but finds it unpersuasive.

habeas corpus review." *McKinnon,* 1995 WL 570918 at *12 (quoting *Derden,* 978 F.2d at 1459). The ultimate question is whether the cumulative effect of the alleged errors deprived the petitioner of fundamental fairness, *Derden,* 978 F.2d at 1457, to the extent that the verdict itself is suspect, *id.* at 1459.

"There are few procedural errors that are sufficiently serious in combination to render a trial fundamentally unfair that do not independently step on some constitutionally assured right." *Derden,* 978 F.2d at 1461 (Higginbotham, J., concurring). The Court concludes that in this case, Scott does not identify any group of actual errors that accumulate to deprive him of a fair trial or fair sentencing, any more than the individual errors themselves. Thus, the Court concludes Scott's assertion that he was deprived of a fair trial through cumulative error is not well-taken on the merits. The first aspect of Scott's nineteenth ground is not well-taken.

The respondent also argues that Scott is procedurally barred from raising the second aspect of his nineteenth ground—the state appeals courts should not have applied a harmless error analysis—because Scott did not raise in the Ohio Supreme Court the argument that the Ohio Court of Appeals used the wrong standard of analysis. Even accepting this argument, however, Scott could not possibly assert in any state court of direct appeal his argument that the Ohio Supreme Court itself also used the wrong standard of analysis, and Scott did raise this argument in state court on collateral review. Accordingly, this Court concludes that Scott is not procedurally barred from arguing in this proceeding that the Ohio Supreme Court should not have applied a harmless error analysis.

On direct appeal, the Ohio Supreme Court arguably concluded that the trial court made certain errors, but that those errors were harmless. *E.g., State v. Scott,* 497 N.E.2d at 66 ("even if the trial court did not sufficiently comply with the requisites of R.C. § 2929.03(F), the subsequent review by the court of appeals and this

court would appear to render any resulting error harmless beyond a reasonable doubt"); *State v. Scott,* 497 N.E.2d at 59 ("the lengthy instruction which the trial judge gave to the prospective jurors after issuing [ ]his comment [about the newspaper article] was such as to minimize any prejudicial effect this comment may have had upon the jurors"). Scott notes that "[s]ome constitutional violations, ... by their very nature cast so much doubt on the fairness of the trial process that, as a matter of law, they can never be considered harmless." *Satterwhite v. Texas,* 486 U.S. 249, 256, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988). Scott asserts that the errors that occurred in his trial—especially those that flowed from the ineffectiveness of his counsel—are the type that cannot be considered harmless, so the Ohio Supreme Court's review was flawed.

Essentially, this argument simply reasserts all of Scott's other arguments, but in the context of inadequate or erroneous review on direct appeal. This Court has already concluded, however, that—with the exception of his eighteenth ground—even if Scott identified any error, the error does not raise any substantial doubt on the fairness of his trial. The Ohio Supreme Court did not employ an incorrect standard of analysis, nor did it incorrectly conclude that any error was harmless. Accordingly, the Court finds Scott's nineteenth ground for relief is not well-taken.

## VIII. Scott's Attacks on the Effectiveness of Prior Counsel

In addition to the grounds already discussed above, Scott raises three additional grounds, all relating to the effectiveness of his prior counsel. Specifically, Scott's fourth ground for relief is that he was "denied the effective assistance of counsel during the guilt/innocence phase of his trial." His fifth ground for relief is that he was "denied the effective assistance of counsel in the mitigation phase of his trial." And his sixth ground for relief is that

he was "denied the effective assistance of appellate counsel."

### A. Scott's Fourth and Fifth Grounds for Relief.

Scott's fourth and fifth grounds for relief both relate to the effectiveness of his trial counsel. The respondent asserts that Scott is procedurally barred from raising these grounds. The Court agrees.

■ It is undisputed that Scott did not raise the ground of ineffectiveness of trial counsel on direct appeal. This is true even though Scott's appellate counsel was different from his trial counsel.[31] It is also undisputed that the trial record, alone, revealed to appellate counsel virtually all of the instances of alleged ineffectiveness of trial counsel. Applying the *Maupin* test, the Court concludes as follows: (1) Scott failed to comply with the state procedural rule that he must raise an assignment of error on direct appeal, Ohio R.App. P. 16(A)(3); (2) the state courts actually enforced the state procedural sanction, *State v. Scott*, 63 Ohio App.3d 304, 578 N.E.2d 841, 844 (1989); (3) the state court procedural forfeiture is an "adequate and independent" ground on which the state can rely to foreclose review of Scott's claims of inadequate assistance of trial counsel, *see Mapson v. Perini*, 1987 WL 44561 (6th Cir.1987), *cert. denied*, 484 U.S. 1044, 108 S.Ct. 779, 98 L.Ed.2d 865 (1988) (concluding a petitioner can "waive[ ] his claim of ineffective assistance of counsel by failing to present it to the Ohio appellate courts"); (4) Scott has not shown there existed "cause" for him to not follow the state procedural rule; and (5) Scott has not shown that he was actually prejudiced by

the alleged constitutional error, *see Wong v. Money*, 142 F.3d 313, 319 (6th Cir.1998) ("to show prejudice, the defendant must demonstrate that there exists a reasonable probability that, absent counsel's unprofessional errors, the results of the proceeding would have been different").

■ As such, with one exception, Scott is procedurally barred from asserting that his trial counsel was so ineffective that he was deprived of his Sixth Amendment right "to have the assistance of counsel for his defence [sic]." The exception is that Scott is not procedurally barred from asserting that his trial counsel was ineffective for failure to investigate and present evidence during the penalty phase of his trial. The respondent concedes Scott is not barred from pursuing this ground, because Scott presented this ground during post-conviction proceedings and the evidence supporting this ground came from "dehors the record." *State v. Scott*, 578 N.E.2d at 846. Thus, the Court examines the merits of only one aspect of Scott's fifth ground for relief—that is, that his trial counsel failed to perform an adequate investigation of, and presentation of, mitigation evidence during the penalty phase of trial.[32]

■ In order to succeed on this claim, Scott must "show both that his counsel's performance 'fell below an objective standard of reasonableness' and that he was prejudiced as a result." *Glenn v. Tate*, 71 F.3d 1204, 1206 (6th Cir.1995) (quoting *Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Regarding the first prong of this test, "[t]he Eighth Amendment requires

---

**31.** *See* footnote 4, *supra.*

**32.** Although the Court examines the merits of only one aspect of Scott's assertions that his trial counsel was ineffective, the Court adds, without explicitly so holding, that it appears the remainder of Scott's fourth and fifth grounds for relief is also not well-taken on the merits. Many of the instances of alleged ineffectiveness identified by Scott are simply repetitions of other grounds the Court has already found non-meritorious—e.g., trial

counsel's failure to object to the trial court's "reasonable doubt" instruction. Scott's other instances of alleged ineffectiveness—e.g., trial counsel's having allowed certain events during trial to occur off the record—do not appear to meet the standard that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

that the jury be able to consider and give effect to all relevant mitigating evidence offered by petitioner." *Boyde v. California,* 494 U.S. 370, 377–78, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). Thus, trial counsel must undertake a reasonable amount of preparation for the sentencing phase of the trial, which must include a reasonable investigation of what mitigating circumstances exist. The importance of this preparation and investigation is underscored by the reality that "the sentencing phase [is] likely to be 'the stage of the proceedings where counsel can do his or her client the most good.'" *Id.* 110 S.Ct. at 1207 (quoting *Kubat,* 867 F.2d at 369). Mitigation investigation in Ohio "is literally of life and death importance," *O'Guinn v. Dutton,* 88 F.3d 1409, 1424 (6th Cir.1996) (Merritt, C.J., concurring), for if the mitigating evidence is insufficient, the jury must recommend that the defendant be sentenced to death. Ohio Rev.Code § 2929.03(D)(2).

Given the importance of presenting mitigating circumstances at the penalty phase of trial, it is objectively unreasonable to wait "until after the jury's verdict in the guilt phase" to begin assembling mitigation witnesses and evidence. *Glenn,* 71 F.3d at 1207 (quoting *Blanco v. Singletary,* 943 F.2d 1477, 1501–02 (11th Cir. 1991), *cert. denied,* 504 U.S. 943, 112 S.Ct. 2282, 119 L.Ed.2d 207 (1992)). Of course, trial counsel may make a reasoned, tactical decision not to present certain evidence in mitigation, perhaps because the evidence carries with it the danger of negatively influencing the jury. *See Gerlaugh v. Stewart,* 129 F.3d 1027, 1033 (9th Cir. 1997) (counsel made a reasonable decision not to introduce evidence that the defendant took care of his friend's pets, "because it could indicate that although [he] was capable of compassion, he reserved it for animals, not human beings"); *Meeks v. Bergen,* 749 F.2d 322, 328 (6th Cir.1984) ("where there is more than one possible defense, and counsel conducts a substantial investigation into the possible defenses, the strategic choice made as a result of the investigation is 'virtually unchallengea-

ble'"). Also, trial counsel may make reasonably diligent efforts to unearth mitigation evidence, but simply fail to locate a witness who would have proved helpful. Further, "resources are never unlimited, and attorneys must always make choices as to what avenues of investigation they are going to pursue." *Brown v. Cain,* 1995 WL 495890 at *19 (E.D.La. Aug.18, 1995), *affirmed,* 104 F.3d 744 (5th Cir. 1997), *cert. denied,* 520 U.S. 1195, 117 S.Ct. 1489, 137 L.Ed.2d 699 (1997). In these instances, trial counsel's efforts cannot be called objectively unreasonable. But a failure by trial counsel to actually investigate his options regarding presentation of mitigating circumstances, and the failure to make a thoughtful, strategic choice, is objectively unreasonable. *Id.* (citing *Horton v. Zant,* 941 F.2d 1449, 1462 (11th Cir.1991), *cert. denied,* 503 U.S. 952, 112 S.Ct. 1516, 117 L.Ed.2d 652 (1992) ("reject[ing] the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them")); *see Cave v. Singletary,* 971 F.2d 1513, 1519 (11th Cir.1992) (granting habeas relief because counsel's failure was "a result of lack of preparation rather than any particular strategy or because witnesses were unavailable"); *Austin v. Bell,* 126 F.3d 843, 849 (6th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1526, 140 L.Ed.2d 677 (1998) (granting partial habeas relief because "Mr. Livingston failed to conduct sufficient investigation, failed to prepare, failed to present evidence, failed to make necessary motions, and failed to function as a meaningful adversary to the government").

Even if Scott can show his trial counsel failed to undertake objectively reasonable efforts to investigate and present mitigating circumstances during the penalty phase of his trial, Scott does not prevail on his claim of ineffective assistance of counsel unless he also shows his counsel's failure caused him prejudice—the second prong of the *Strickland* test. To show prejudice, Scott must show a "reasonable

probability" that, but for his counsel's unprofessional errors, the result would have been different. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. Scott "does not have to show that his counsel's deficient conduct 'more likely than not altered the outcome in the case.'" *Glenn*, 71 F.3d at 1210 (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052). Rather, the question "is whether counsel's errors were serious enough to deprive the petitioner of a proceeding the result of which was 'reliable,'—'whether counsel's conduct so undermined the proper functioning of the adversarial system that the trial [a term that includes capital sentencing proceedings] cannot be relied on as having produced a just result.'" *Id.* at 1210–11 (quoting Strickland, 466 U.S. at 686, 104 S.Ct. 2052) (citations omitted) (brackets in original).

■ Finally, this Court "must defer to state court factual findings, according [them] a presumption of correctness that [Scott] may rebut only with clear and convincing evidence." *Groseclose v. Bell*, 130 F.3d 1161, 1163–64 (6th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1826, 140 L.Ed.2d 962 (1998). "The presumption only applies to basic, primary facts, and not to mixed questions of law and fact"— such as the ultimate question of the ineffectiveness of counsel—which receive de novo review. *Id.* at 1164. Thus, this Court must presume correct any underlying state court factual findings relating to Scott's claim of ineffectiveness of trial counsel during the mitigation phase of trial, but must not defer to the state court's ultimate conclusion of whether counsel was ineffective.[33]

■ In this case, Scott's trial counsel did not present *any* evidence of outside mitigating circumstances at the penalty phase of trial. Rather, counsel pursued a "residual doubt" theory, which involves

presentation of "further evidence in an attempt to instill in the jury a reasonable doubt of guilt, with the apparent aim of persuading the jury that the death penalty should not be imposed where some doubt as to guilt remained." *State v. Apanovitch*, 33 Ohio St.3d 19, 514 N.E.2d 394, 402 (1987). Thus, the sentencing jury did not hear any of the following evidence, which was subsequently offered by Scott's relatives during post-conviction proceedings:

> [Scott] was the sixth of eleven children whose father and mother were frequently absent and who separated when [Scott] was fourteen. His parents and his siblings abused alcohol and other drugs and lived in poverty so severe that sometimes there was no heat, and an aunt, a neighbor or governmental agency supplied food. Money was gambled away by his father. Extreme violence between the parents and against the children was routine. The father stabbed the mother. [Scott] and his siblings were tied to chairs and beaten. The mother's boyfriend also beat the children. A brother tried to intervene in a fight between the mother and a boyfriend and was killed. A sister was shot to death. A brother is a quadriplegic from a gunshot wound from his brother-in-law. A sister was acquitted of murder in the shooting of a brother-in-law.
>
> Nevertheless there was a [family] closeness particularly on the part of [Scott] who tried to help his sisters (who were involved in abusive relationships and using drugs) and [who] tried to reunite estranged family members. He gave the sisters money and tried to persuade his siblings to get educated and limit their families. When he was young he attempted to protect his mother from

33. As noted earlier, because the AEDPA amendments do not apply retroactively to cases pending at the date of enactment, they are not applicable to this case. *Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 2068, 138 L.Ed.2d 481 (1997). Thus, this court applies the former statute's presumption of correctness regarding state court determinations, 28 U.S.C. § 2254(d) (1994), rather than the new standards requiring greater deference to the state courts as provided in the amended statute, 28 U.S.C. § 2254(e) (1998).

his father's physical abuse. When he was older he tried to help children in the neighborhood and attempted to "read books and study the law." When he had steady employment he provided for his girlfriend and her children. He was looking for a job at the time of the offense and was a good father to his son.

*State v. Scott,* 578 N.E.2d at 845 (summarizing the affidavits of Scott's friends and relatives).

The trial court held an evidentiary hearing to determine why Scott's trial counsel did not present this mitigation evidence, and whether trial counsel conducted an adequate investigation and preparation for the penalty phase of Scott's trial. *See State v. Scott,* 63 Ohio App.3d 304, 578 N.E.2d 841, 844–46 (1989) (remanding for an evidentiary hearing on post-conviction review). The trial court made the following "findings of fact:" [34]

(1) The testimony of the trial counsel is more credible than the testimony of the family members.

(2) The defendant did not provide his attorneys with the identity or the location of the defendant-petitioner's family members. Trial counsel found it difficult to ascertain where the family members were during the trial and mitigation phase.

(3) Family members, even though intermittently attending the trial, failed to approach counsel and identify themselves. The family members have *only now* made themselves known and are *now appearing* to testify at this late date.

(4) Defendant refused to permit or participate in the psychiatric examination or pre-sentence investigation allowed by Ohio Revised Code Section 2929.03(D) and (E). By refusing to allow the pre-sentence investigation, defendant prevented introduction to the jury of his past criminal activities. The pre-sentence investigation would have provided to the jury defendant's prior felony convictions for

Armed Robbery, Kidnaping with specifications, Aggravated Assault with specifications, Escape with specifications, and Felonious Assault.

(5) A tactical decision by trial counsel was made not to call any family members to testify during the mitigation phase of the trial. The purpose for not offering the testimony was to avoid opening the door on defendant-petitioner's past criminal activities. It was in the *best interest of the defendant* to avoid giving the jury an opportunity to hear about his criminal record. Counsel believed that the information would have been detrimental to the defendant's case and failure to introduce the testimony would not prejudice the defendant.

(6) The testimony of the family members was inconsistent, contradictory, incomplete and unbelievable in many respects, and instead of presenting mitigating factors, did, in fact, fail to present evidence such to outweigh the aggravating circumstances.

*State v. Scott,* case no. 182521–D, slip op. at 2–3 (Ohio Ct. Comm. Pleas Sep. 10, 1991) (emphasis in original).

Based on these findings, the trial court concluded that Scott's trial counsel was not ineffective. Primarily, the trial court concluded that counsel's decision "not to introduce testimony of defendant's family was a reasonable decision based upon the information which the jury would have received on cross-examination." *Id.* 1988 WL 132574, at 4. The state court of appeals affirmed the trial court's conclusion, stating:

The theory which both attorneys felt would present the best hope to avoid a death sentence was a theory of residual doubt. Because [Scott] had claimed throughout the trial proceedings to be innocent, it seemed inconsistent to have family, friends and [Scott] testify to his

---

**34.** The last two findings are somewhat mixed with conclusions of law.

tragic childhood. A traumatic family life explains for the jury why a defendant might be inclined to choose a life of crime. This is not evidence to support a theory of innocence. Similarly, a psychiatric report would have been potentially damaging in that it would have linked [Scott's] childhood experiences to his poor judgment as an adult in committing crimes. [Scott's] unsworn statement made during the mitigation phase was supposed to provide further support for the theory of residual doubt without exposing [Scott] to cross-examination concerning his criminal history.

\*　　\*　　\*　　\*　　\*　　\*

[Scott] has failed to prove that his trial attorneys breached their duty to provide effective assistance of counsel. Based upon the testimony of the two attorneys at the hearing below, we find that the decision to present to the jury [Scott's] unsworn statement was an informed decision and a reasonable mitigation phase tactic. In addition, upon consideration of the evidence adduced and proffered by [Scott] at his postconviction hearing, we find that there is no reasonable basis to conclude that [Scott] was prejudiced by trial counsel's claimed failure to further investigate and present

this testimony at [Scott's] mitigation hearing.

*State v. Scott*, 1993 WL 267109 at \*2.

Scott challenges the state court's conclusion by noting that the jury reached its guilty verdict in **"fifteen minutes,** a development that 'stunned' one of Mr. Scott's lawyers," and arguing that "[a] 'decision' to pursue a 'residual doubt' theory in these circumstances could arguably *never* be considered a reasonable strategic one." Traverse at 36 (emphasis in original).[35] It is clear that Scott's trial counsel was "between a rock and a hard place." Counsel had the options of: (1) pursuing a residual doubt theory in front of a jury that apparently had little doubt of Scott's guilt; [36] and (2) presenting witnesses who would testify regarding various mitigating circumstances, but thereby virtually assuring that the jury would learn of Scott's extensive violent criminal background. The question in this case boils down to whether counsel was ineffective for choosing the former option without further investigating the latter. Was it reasonable for trial counsel to conclude that, even if they interviewed all of Scott's family and friends— and no matter what evidence they unearthed of mitigating circumstances—the evidence of Scott's criminal background that would also come in would be too dam-

---

**35.** The respondent's answer to this, during oral argument on November 12, 1997, was clever: Scott's own argument in his petition that there was insufficient evidence to support the verdict (Scott's ninth grounds) suggests it *was* reasonable to pursue a residual doubt theory. It is also notable that the Supreme Court has approved generally of the residual doubt theory: "jurors who decide both guilt and penalty are likely to form residual doubts or 'whimsical' doubts ... about the evidence so as to bend them to decide against the death penalty. Such residual doubt has been recognized as an extremely effective argument for defendants in capital cases." *Lockhart v. McCree,* 476 U.S. 162, 181, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) (reversing the grant of a petition for writ of habeas corpus, and quoting the dissenting opinion below).

**36.** As the Ohio Supreme Court noted, "[a]n appeal to residual doubt is unlikely to weigh

heavily with a jury that has already found that no reasonable doubt of guilt exists. Furthermore, such a strategy presents its own dangers, as the jury may feel that the defense is questioning its intelligence or integrity." *State v. Tyler,* 50 Ohio St.3d 24, 553 N.E.2d 576, 595 (1990), *cert. denied,* 498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 334 (1990). On the other hand, the Ohio Supreme Court has also stated that "the mere failure to present mitigating evidence at the penalty phase of a capital trial does not itself constitute proof of ineffective assistance of counsel or deprivation of the accused's right to a fair trial." *State v. Johnson,* 24 Ohio St.3d 87, 494 N.E.2d 1061, 1065 (1986). "It is conceivable that the omission of such evidence in an appropriate case could be in response to the demands of the accused or the result of a tactical, informed decision by counsel, completely consonant with his duties to represent the accused effectively." *Id.*

aging to Scott's goal of avoiding a sentence of death? Or was it unreasonable for trial counsel to reach this conclusion without first investigating precisely what was the evidence of the mitigating circumstances?

Given the "strong presumption that counsel's performance falls within the 'wide range of professional assistance,'" the Court is inclined to find that trial counsel's choice was reasonable, and thus that counsel was not ineffective. *Kimmelman v. Morrison*, 477 U.S. 365, 381, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986); *see Strickland*, 466 U.S. at 690, 104 S.Ct. 2052 ("counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment"). Trial counsel's "primary concern to keep [Scott's] criminal record from the jury" was a reasonable tactical decision. *State v. Scott*, 1993 WL 267109 at *1. The Supreme Court has explicitly held that a decision by defense counsel "to forego presentation of mitigating evidence—after evaluating available testimony and determining that cross-examination would reveal matters prejudicial to the defendant— and to instead make a lesser culpability argument to the jury" can be reasonable. *Kubat*, 867 F.2d at 368 (discussing *Burger v. Kemp*, 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987)). On the other hand, the Court is slightly hesitant to reach this conclusion, because it affords trial counsel with an easy, post-hoc excuse for not having done any investigation into mitigating circumstances—"no matter what we find, we won't use it, because we don't want the jury to learn of the defendant's prior criminal record, so we won't try to find anything."

In the end, the Court concludes that, even if Scott's trial counsel was ineffective, Scott cannot prevail on his fifth ground because he cannot show a "reasonable probability" that, but for his counsel's alleged error, the result would have been different. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. This is not a case, like *Kubat*, where defense counsel gave a "grossly substandard" closing argument during the sentencing phase that was "a rambling, incoherent discourse ... that may actually have strengthened the jury's resolve to impose a death sentence." *Kubat*, 867 F.2d at 368. Nor is this a case where defense counsel's failures during trial were so continuous and egregious, including failures "to conduct sufficient investigation, ... to file sufficient pretrial motions, ... to present evidence at sentencing, and ... to call critically important witnesses during the guilt phase of trial," that prejudice can be "presumed." *Austin v. Bell*, 938 F.Supp. 1308, 1322, 1324 (M.D.Tenn.1996), *aff'd in part and rev'd in part*, 126 F.3d 843 (6th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1526, 140 L.Ed.2d 677 (1998). In other words, unlike the defendants in *Kubat* and *Austin*, Scott cannot show his counsel's choice to pursue a residual doubt theory actually harmed his case. The mitigating circumstances Scott wishes his counsel had presented to the sentencing jury in order to elicit mercy— the historical, tragic events of his life—are largely, even overwhelmingly, negated by evidence that his background includes commission of robbery, assault, kidnaping, and other violent acts upon innocent citizens. The Court cannot conclude there is a reasonable probability that a jury, upon hearing the entirety of this background, would have felt mercy for Scott.[37] Scott

---

**37.** The Court concedes that this, too, is a "close call." It is impossible to say with complete assuredness that "one juror in twelve [would not find Scott's background] so bleak, so deprived, so harrowing, so full of horrors..., as to reduce [Scott's] moral responsibility for the murder of [Prince] to a level at which capital punishment would strike that juror as excessive or one or more

of the jurors would think [Scott] deserving of mercy." *Emerson v. Gramley*, 91 F.3d 898, 907 (7th Cir.1996), *cert. denied*, 520 U.S. 1122, 117 S.Ct. 1260, 137 L.Ed.2d 339 (1997). Ultimately, the Court's conclusion that Scott's eighteenth ground is well-taken moots Scott's fifth ground, as the remedy— resentencing—would be the same.

has not shown that his counsel's alleged failure at the sentencing phase of his trial was so serious that it deprived him of a reliably just sentencing proceeding.

The "threshold issue is not whether [Scott's] attorney was [merely] inadequate; rather, it is whether he was so manifestly ineffective that defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir.1992), *cert. denied*, 508 U.S. 975, 113 S.Ct. 2969, 125 L.Ed.2d 668 (1993). *Kubat* and *Austin* are examples of the rare case where defense counsel's egregious ineffectiveness probably harmed his own client.[38] Scott does not show the existence of similar circumstances in this case. Accordingly, the Court finds Scott's fourth and fifth grounds for relief, in their entirety, are not well-taken.

### B. Scott's Sixth Ground for Relief.

Scott's sixth ground for relief is that he was "denied the effective assistance of appellate counsel." Scott argues that his appellate counsel "failed to raise several critical and meritorious issues on direct appeal" and "failed to provide the reviewing courts with transcripts of the entire proceeding, including the transcript of the arraignment, the bond hearing and the pretrial motion hearing." Traverse at 38–39. The respondent does not argue that Scott is procedurally barred from arguing this ground.[39]

■ A defendant is entitled to effective assistance of counsel in his first appeal as a matter of right. *Evitts v. Lucey*, 469 U.S. 387, 396, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). The two-part test

enunciated in *Strickland*, discussed immediately above, is also applicable to claims of ineffective assistance of appellate counsel: Scott must show that his appellate counsel's performance was deficient, and that the deficient performance so prejudiced the defense that the proceedings were unfair and the result unreliable. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. An appellant has no constitutional right to have every non-frivolous issue raised on appeal, *Jones v. Barnes*, 463 U.S. 745, 750–54, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), and tactical choices regarding issues to raise on appeal are properly left to the sound professional judgment of counsel. *United States v. Perry*, 908 F.2d 56, 59 (6th Cir.), *cert. denied*, 498 U.S. 1002, 111 S.Ct. 565, 112 L.Ed.2d 571 (1990).

■ Indeed,

[m]ost cases present only one, two, or three significant questions .... Usually, ... if you cannot win on a few major points, the others are not likely to help, and to attempt to deal with a great many in the limited number of pages allowed for briefs will mean that none may receive adequate attention. The effect of adding weak arguments will be to dilute the force of the stronger ones.

*Jones*, 463 U.S. at 752, 103 S.Ct. 3308 (quoting R. Stern, *Appellate Practice in the United States* 266 (1981)). Moreover, an attorney is not required to present an argument on appeal for which there is no good-faith factual support, in order to avoid a charge of ineffective representation. *Krist v. Foltz*, 804 F.2d 944, 946–47 (6th Cir.1986).

---

**38.** Indeed, the *Kubat* court found that defense counsel's other errors at trial were *not* so egregious that there was a reasonable probability that the jury's verdict would have been different. *E.g., Kubat*, 867 F.2d at 362 ("[e]ven accepting that counsel's decision not to call Ms. Elea was professionally incompetent, however, we find that Kubat has not demonstrated that he was prejudiced by the error").

**39.** Respondent did not argue in his return that Scott waived his sixth ground for relief.

Return at 39. Respondent did argue in his post-hearing brief, for the first time, that Scott was procedurally barred from pursuing his sixth ground for relief, on the basis that Scott failed to abide by the time limits set out in Ohio R.App. Proc. 26. Post-hearing brief at 8–9. Because the timing of respondent's presentation of this argument did not allow Scott to respond, and because it is not immediately clear that respondent's argument is well-taken, the Court does not address it.

In this case, Scott has not come close to showing that his appellate counsel was ineffective. Scott asserts that his counsel's choices not to raise certain issues on appeal was deficient, but he does not explain how his counsel's judgment was objectively unreasonable, and the Court finds it was not. Further, Scott has "failed to establish prejudice because he has not shown that the direct appeal of [those] issue[s] [that appellate counsel did not raise] would likely have been successful." *Leggett v. United States,* 1996 WL 665580 at *2 (6th Cir. Nov.14, 1996). Accordingly, the Court finds Scott's six ground for relief is not well-taken.

### IX. *Conclusion.*

The Court finds that all but one of the grounds raised by Scott in his petition for writ of habeas corpus are not well-taken— on the merits, or because of a procedural bar, or both. The Court does find meritorious, however, Scott's eighteenth ground, where he challenges the constitutionality of the trial court's imposition of the death penalty. Specifically, the Court finds that the trial judge improperly instructed the jurors that they must unanimously recommend a life sentence.

Accordingly, the Court grants Scott's petition in part, and issues a writ of habeas corpus as follows. The respondent shall either: (1) set aside Scott's sentence of death and instead impose a life sentence; or (2) conduct another sentencing trial. The respondent shall resentence Scott, or conduct a new sentencing proceeding, within 180 days from the effective date of this Order. On this Court's own motion, execution of this Order and, hence, its effective date, is stayed pending appeal by the parties.

**IT IS SO ORDERED.**

### *ORDER*

For the reasons stated in this Court's Opinion and Order of this date, the Court grants Scott's petition in part, and issues a writ of habeas corpus as follows. The respondent shall either: (1) set aside Scott's sentence of death and instead impose a life sentence; or (2) conduct another sentencing trial. The respondent shall resentence Scott, or conduct a new sentencing proceeding, within 180 days from the effective date of this Order. On this Court's own motion, execution of this Order and, hence, its effective date, is stayed pending appeal by the parties. This matter is hereby **DISMISSED.**

**IT IS SO ORDERED.**